UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RAFAEL L. WALKER, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| ARMARK FOOD SERVICES, | ) |
| FRANK VANIHEL, | ) |
| CHRIS HOLCOMB Lt., | ) |
| SIMMERMAN Sgt., | ) |
| SMITH Sgt., | ) |
| THOMAS WELLINGTON, Grievance Manager, | ) |
| SHELBY CRICHFIELD, Grievance Specialist, | ) |
| J. JOBE Ofc., | ) |
| NEFF Ofc., | ) |
| ARNOLD Ofc., | ) |
| B. BUTLER, Armark Supervisor, | ) |
| | ) |
| *Defendants*. | ) |

No. 1:23-cv-00573-JMS-TAB

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Rafael L. Walker alleges that he was subjected to inhumane conditions while incarcerated at the Wabash Valley Correctional Facility (the "prison").  The core of Mr. Walker's complaint is an Eighth Amendment claim that he received inadequate and sometimes spoiled food, which he claims led to significant weight loss and health issues, and a First Amendment claim that he was retaliated against for filing grievances and a lawsuit against some of the Defendants.  The Defendants include Aramark Food Services and several correctional officers and officials, who are accused of failing to address these issues adequately.  Defendants Aramark Food Services

("Aramark")[1] and Food Service Manager B. Butler (the "Aramark Defendants") have filed a Motion for Summary Judgment related to Mr. Walker's Eighth Amendment claim.  [Filing No. 46.] And Defendants Warden Frank Vanihel (the "Warden"), Lieutenant Chris Holcomb, Sgt. Simmerman, Sgt. Smith, Officer J. Jobe, Officer Neff, Officer Arnold, Grievance Manager Thomas Wellington, and Grievance Specialist Shelby Crichfield (the "Corrections Defendants") have jointly filed a Motion for Summary Judgment related to Mr. Walker's Eighth Amendment claim. [Filing No. 50.]  Part of that Motion also seeks summary judgment on Mr. Walker's claim that Officer Jobe retaliated against him for filing a grievance in violation of the First Amendment.  Each Motion is ripe for the Court's review.

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact, so that as a matter of law, the moving party is entitled to judgment.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).   "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

---

[1] The Court notes at the outset that Mr. Walker has withdrawn his claim against Aramark based on *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), [Filing No. 65 at 32], so the claim will not be discussed further, and the Court **GRANTS** the Aramark Defendants' Motion for Summary Judgment as to Mr. Walker's Eighth Amendment claim against Aramark Food Services.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted supporting or opposing a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  S.D. Ind. L.R. 56-1(e).  Each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."  *Id.*  Only the cited materials must be considered by the Court; the Court need not "scour the record" for potentially relevant evidence.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).  Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts do not affect the outcome.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). In this case, that is Mr. Walker.

### A.      The Parties

Mr. Walker was an inmate incarcerated at the prison from January 28, 2021, to December 15, 2023, and resided in the restricted housing unit. [Filing No. 65 at 5.]

Aramark Food Services is "a private corporation that was contracted by the [Indiana Department of Corrections ("IDOC")] to provide inmate meal services." [Filing No. 51-2 at 2 n.1.] Food Service Manager Butler "oversaw the daily food service at" the prison. [Filing No. 48-1 at 1.]

Lieutenant Chris Holcomb, Sgt. Simmerman, Sgt. Smith, Officer J. Jobe, Officer Neff, and Officer Arnold (the "Officer Defendants") were all corrections officers who at some time or another worked in the restricted housing unit in the prison and interacted with Mr. Walker. [Filing No. 51-1 at 40-41 (Mr. Walker describing the involvement of Lt. Holcomb); Filing No. 51-6 at 27 (Mr. Walker describing interaction with Sgt. Simmerman); Filing No. 51-6 at 28 (Mr. Walker describing complaints about trays to Sgt. Smith); Filing No. 51-1 at 110 (Mr. Walker alleging that Officer Jobe put hair in his food); Filing No. 51-1 at 48 (Mr. Walker describing being refused a replacement tray from Officer Neff); Filing No. 51-1 at 83 (Mr. Walker recalling that Officer Arnold had refused to give him a replacement tray).]

Grievance Manager Thomas Wellington and Grievance Specialist Shelby Crichfield adjudicated grievances in the prison, some of which were Mr. Walker's. [Filing No. 51-1 at 33.]

4

Warden Vanihel is the Warden of the prison.

**B.    Aramark's Food Contract, the Master Menu, and the Tray Replacement Policy**

Aramark's contract requires it to provide meals pursuant to a "Master Menu," which meets standards of the IDOC, "Aramark's registered dietician," and the American Correctional Association. [Filing No. 48-1 at 2.] The Master Menu stipulates that "[t]he standard daily meals" at the prison add up to approximately "2500 – 2800 daily calories." [Filing No. 48-1 at 2.]

Aramark Food Service Manager Butler "oversaw the preparation of meals to confirm they [were] consistent with meals identified by the IDOC under the Contract." [Filing No. 48-1 at 1-2.] He "instructed and train[ed] [his] staff to do the same." [Filing No. 48-1 at 2.] Checking for consistency meant "ensur[ing] the correct menu items [were] on the trays with the correct portions, as well as ensuring the menu items [were] not spoiled in any way and safe for inmates to consume." [Filing No. 48-1 at 2-3.] Food Service Manager Butler explains that "to create adequate and uniform food portions, each food item is served with a designated utensil" pre-measured for the correct amount of food. [Filing No. 48-1 at 3.] Using those utensils, "Aramark employees and inmates assigned to the Aramark kitchen prepare the trays," which "are then covered and put on a cart." [Filing No. 48-1 at 3.] Along with the cart, Food Service Manager Butler "sent extra trays to the restricted housing units for each meal served" just in case some trays had "small portions." [Filing No. 69-1 at 1.] He also sent "sample trays with each meal to the restricted housing units" to compare served trays with the sample trays. [Filing No. 69-1 at 2.] "An Aramark employee then deliver[ed] th[e] cart" of trays to the restricted housing units. [Filing No. 48-1 at 3.] Correctional officers then passed out the trays "at random" down the range to each prisoner's holding cell. [Filing No. 48-1 at 3 ("at random"); *See* Filing No. 51-1 at 120-121 (Mr. Walker describing seeing trays from his holding cell).] The correctional officers involved in this process

included, among others, the Officer Defendants. [Filing No. 51-1 at 40-41 (Mr. Walker describing the involvement of Lt. Holcomb); Filing No. 51-6 at 27 (Mr. Walker describing interaction with Sgt. Simmerman); Filing No. 51-6 at 28 (Mr. Walker describing complaints about trays to Sgt. Smith); Filing No. 51-1 at 110 (Mr. Walker alleging that Officer Jobe put hair in his food); Filing No. 51-1 at 48 (Mr. Walker describing being refused a replacement tray from Officer Neff); Filing No. 51-1 at 83 (Mr. Walker recalling that Officer Arnold had refused to give him a replacement tray).]

When an inmate received a food tray he complained was "unsatisfactory," he purportedly could utilize the IDOC's "Tray Replacement Policy." [Filing No. 48-1 at 3.] The Tray Replacement Policy was intended to allow "an inmate to report any issues with [his] tray to a correctional officer. The correctional officer then inspects the tray to confirm the inmate's complaint." [Filing No. 48-1 at 3.]

As to how the Tray Replacement Policy actually worked, the parties provide conflicting descriptions: the Warden states that in restricted housing units, "the unit supervisor and pod officer were the only on-site personnel who had the authority to contact Aramark regarding meal service issues and/or request replacement trays or food." [Filing No. 51-2 at 5.] He elaborates that "[i]f the unit supervisor or pod officer determined that the meal tray was seriously deficient in some way . . . they were required to report the issue to Aramark and request replacement trays or supplementary meal items to give to the inmate." [Filing No. 51-2 at 6.]

Food Service Manager Butler describes the policy with fewer restrictions on replacement-tray authority. [Filing No. 48-1 at 3.] He states that "[i]f the correctional officer agrees the inmate's complaint is valid, the correctional officer issues a new tray to the inmate." [Filing No. 48-1 at 3.] "Correctional officer" is undefined and does not specify which correctional officer and at what

rank.  [Filing No. 48-1 at 3.]  In his supplemental declaration, he remains non-specific, stating that "[i]f a restricted housing unit did not have enough replacement trays," "they" could request "as many as they needed."  [Filing No. 69-1 at 1-2.]  It is unclear who "they" refers to specifically and whether "they" includes all officers or only certain supervisors.  [Filing No. 69-1 at 1-2.]

Mr. Walker's understanding of the Tray Replacement Policy is that "inmates can utilize [it] when they require a replacement food tray if the tray they have received is unsatisfactory.  The Tray Replacement Policy allows an inmate to report any issue with [his] tray to the IDOC correctional officer."  [Filing No. 65 at 28.]  Mr. Walker does not specify exactly which correctional officer had authority to request a replacement tray, but as the record will show, he believes that at least some of the Defendants had the ability to replace an inadequate food tray.  [Filing No. 65 at 28.]

No written Tray Replacement Policy has been located in the record to resolve this dispute. Because disputes are resolved in favor of Mr. Walker, for the purposes of summary judgment, the Court utilizes Mr. Walker's understanding of the Tray Replacement Policy.

### C.    Mr. Walker Is Allegedly Assaulted by Officer Jobe and Another Officer

Mr. Walker alleges that on January 6, 2022, he was assaulted by Officer Jobe and non-party Officer Tierney.  [Filing No. 51-1 at 104.]  Mr. Walker states that he filed grievances and "reported the incident to Lieutenant Holcomb . . . [Warden] Vanihel and some of the other defendants, and defendants not named in this case."  [Filing No. 51-1 at 104; Filing No. 51-1 at 107.]  Mr. Walker ultimately filed two lawsuits against Officer Jobe and others involved, claiming excessive force.

Those cases include this current litigation, No. 1:23-cv-573-JMS-TAB, and a second suit within this district, *Walker v. Vanihel et al.*, No. 2:22-cv-197-MPB-MJD.[2]

In the weeks after complaining about Officer Jobe's alleged assault, Mr. Walker began to discover "hair in [his] food," which he believed to be Officer Jobe's. [Filing No. 51-1 at 105.] Each time Mr. Walker discovered hair in his food, he would confront Officer Jobe about it, leading to an argument about how Officer Jobe would not change it. [Filing No. 51-1 at 1-5.] Mr. Walker states that Officer Jobe would then "get to calling [him] homophobic slurs, calling [him] a snitch . . . and telling other inmates he'd pay them to do something to [him]." [Filing No. 51-1 at 105-106.] He believes that Officer Jobe and Sergeant Simmerman "had a hit out against [him]." [Filing No. 51-1 at 106.] Because of his concerns about tampering with his food, Mr. Walker states that he went "two, three weeks without even eating" because he "was scared to eat [his] food due to the situation." [Filing No. 51-1 at 108.] He notes that he "filed a healthcare request for mental health" to cope with the psychological fallout of the alleged retaliation. [Filing No. 51-1 at 108.] Mr. Walker never personally witnessed Officer Jobe putting hair in his food, but he alleges that Officer Jobe divulged putting the hair in his food because "you told on me and my brother." [Filing No. 51-1 at 111.] He states that he has witnesses who would attest that Officer Jobe said he placed the hair and called Mr. Walker slurs and a snitch. [Filing No. 51-1 at 112-113.] Mr. Walker states that he "would only find the hair when Officer Jobe . . . passed out the trays. Anybody else

---

[2] Regarding Mr. Walker's excessive force claim, the Court granted Officer Jobe's Motion to Dismiss the excessive-force claim from this case to avoid duplicative litigation, as a separate claim was filed in *Walker v. Vanihel et al.*, No. 2:22-cv-197-MPB-MJD (the "Excessive Force Case"), [Filing No. 55 at 1.] The Excessive Force Case did not involve a retaliation claim. [Filing No. 162 at 4 n.5 in the Excessive Force Case.] The Court granted summary judgment in favor of the Defendants. [Filing No. 162 at 17 in the Excessive Force Case.]. Accordingly, the excessive force claim is no longer at issue.

working, [he] would never find hair." [Filing No. 51-1 at 116.]  He believes that there was also "spit in the food," which he suspected from "little white stuff" he saw on his tray.  [Filing No. 51-1 at 117.]  But he never witnessed Officer Jobe spitting in his food, nor did Officer Jobe ever tell him there was spit in his food.  [Filing No. 51-1 at 117.]

### D.    A Prison Official Reports a Food-Tray Portion Shortage to the Warden

On February 5, 2022, Sgt. T. Leffler reported to the Warden that in the secured housing unit they "received trays for dinner chow.  While examining the trays, [he] discovered that the tray portions were not correct, nor were they in the right spot according to the menu.  By this happening, it causes major issues between staff and offenders."  [Filing No. 65 at 191.]

### E.    Mr. Walker Receives Inadequate Food and Loses Weight

According to Mr. Walker, in mid-January 2022 – around the time of the alleged assault by Officer Jobe – his weight was 195 pounds.  [*See* Filing No. 1-1 at 30.]  Within two months after the alleged assault, Mr. Walker's weight fell to 183 pounds and then by March 24, 2022, his weight was 175 pounds.  [Filing No. 1-1 at 30; Filing No. 51-8 at 28.]  He told medical staff that he believed he was "experiencing unexplained rapid weight loss."  [Filing No. 51-8 at 28.]

The next month, Mr. Walker filed a grievance on April 4, 2022, stating that a few days earlier, "[t]he portion on [his] tray was short the whole day[.]  [T]his is starting to be a recurring thing as this is not the first time & [he could not] order food so [he] need[ed] [all] the calories he [could] possibl[y] have."  [Filing No. 51-6 at 7.]  Mr. Walker was able to discern that there was a shortage because he was typically able to see the comparison between the sample trays and the actual trays from his vantage point in his holding cell.  [Filing No. 51-1 at 120-121.]  Additionally, as far back as 2006, Mr. Walker worked in a prison kitchen run by Aramark.  [Filing No. 51-1 at 30.]  He also worked in the kitchen in 2007, 2009, and 2017.  [Filing No. 51-1 at 30.]  In the kitchen, Mr. Walker "served food," "cleaned up," "worked in the bakery," "worked on the dish

cart," "worked on the loading dock," made food, and "did pretty much everything back there," so he was familiar with the correct portions.  [Filing No. 51-1 at 30.]  Also, he had been incarcerated for some time, so he knew that the trays were pre-portioned and also knew when the tray portions fell short.  [Filing No. 51-1 at 59-60 (stating that he has "been eating the same serving of macaroni for 12 years," so he "can tell when it's not eight ounces").]

The next day, on April 5, Grievance Specialist Crichfield returned Mr. Walker's grievance, stating that it was not specific enough because he "d[id] not list any specific incident, [d]ate, time, etc."  [Filing No. 51-6 at 6.]  Two days later, on April 7, Mr. Walker filed a second grievance about this same incident.  [Filing No. 51-6 at 9.]  The grievance was largely the same; Mr. Walker stated that "[his] portion on [his] tray was inadequate & short the whole day[.  He was] not allowed to buy [his] own food, so [he] need[ed] all calories that the D.O.C. is to provide on [his] tray."  [Filing No. 51-6 at 9.]  On April 12, Grievance Specialist Crichfield returned Mr. Walker's grievance yet again because there were "[n]o specifics listed.  Which tray, which items, etc."  [Filing No. 51-6 at 8.]

On April 22, 2022, Mr. Walker wrote in a grievance that earlier that day, "[t]he portions on [his] trays were not right.  All day, they were all short[.]  [He] informed officer on range."  [Filing No. 51-6 at 35.]  On May 5, 2022, Grievance Specialist Crichfield emailed Food Service Manager Butler requesting that he review Mr. Walker's grievance and return his result to her and Grievance Manager Wellington.  [Filing No. 51-6 at 36.]  On May 23, Mr. Walker received a response in which Grievance Specialist Crichfield stated that "[t]here is no evidence to support your claim, however, [Food Service Manager] Butler is going to instruct staff to make sure they are monitoring the portion sizes going out of the kitchen."  [Filing No. 51-6 at 43.]  In the same response, Food Service Manager Butler stated that he would "have Aramark supervisors monitor portions and

make sure that the trays are getting the right serving portions according to the menus." [Filing No. 51-6 at 38.]  Mr. Walker filed a Grievance Appeal, stating that "[i]f the Aramark supervisors are monitoring trays then they are deliberately making portions on trays short and this is a repeated pattern of behavior." [Filing No. 51-6 at 39.]

On June 21, 2022, Mr. Walker's earlier appeal was denied.  [Filing No. 51-6 at 43.]  On July 10, 2022, Mr. Walker filed a grievance stating that on that day and the three days prior he had received inadequate "portions on [his] breakfast, lunch, [and] dinner trays." [Filing No. 51-6 at 30.]  He stated that "Lt. Holcomb took pictures of the lunch trays and order[ed] kitchen workers to start correcting them, but since then the trays are getting lesser which [he] feels is retaliation for telling Lt. Holcomb that portions are incorrect leaving [him] to suffer from hunger pain from lack of calories." [Filing No. 51-6 at 30.]

By July 29, 2022, Mr. Walker weighed 167 pounds.  [Filing No. 51-8 at 26.]

On August 14, 2022, Mr. Walker wrote in a grievance that the trays were short on food portions for roughly two weeks and that his "breakfast, lunch & dinner portions on [his] tray [were] incorrect & short depriving [him] of the calories [he is] supposed to receive per day causing hunger pains & weight loss & mental & emotional distress." [Filing No. 65 at 96.]  His grievance stated that he showed "every Ofc. [his] trays & asked them to notify Lt. Holcomb, the Sgt., & Armark" but "nothing has been done." [Filing No. 65 at 96.]  Two days later, on August 16, Grievance Specialist Crichfield returned Mr. Walker's grievance because he did not adequately describe the exact date the food-portion issues occurred, writing that he should describe "one specific incident [e.g.] 'on this date at this time this happened.'" [Filing No. 65 at 13.]  On August 16, the same day, Mr. Walker filed a grievance stating that his "dinner tray was spoiled or rotten on [August 16];" to

blame was the "chili mac, and now [he] is having stomach pain, vomiting, & diarrhea, and flu like symptoms." [Filing No. 51-6 at 23.]

On August 18, 2022, Mr. Walker submitted a revised grievance related to his August 14, 2022 grievance, in which he described largely the same incident but stated each date individually. [Filing No. 51-6 at 18-19.] He added that he showed his tray to staff who "confirmed it was incorrect," and that "this is causing [him] fatigue, migraines, hunger pain, & rapid weight loss from not receiving [the] correct amount of calories as well as psychological issues from having food insecurities and being deliberately denied correct portion[s] as a form of punishment [which] is cruel and unusual punishment." [Filing No. 51-6 at 18-19.]

On August 22, 2022, Mr. Walker wrote in a grievance that for over a week, his "breakfast, lunch, dinner tray portions were incorrect [and he] reported it to staff who confirmed portion[s] were short but said they couldn't do anything [because] it's Ar[a]mark who makes trays this is causing me to los[e] weight rapid[ly], and suffer from fatigue, insomn[ia], [and] migr[aines]." [Filing No. 65 at 102.]   On August 24, Grievance Specialist Crichfield returned Mr. Walker's grievance, stating that "[t]his issue has been previously addressed." [Filing No. 51-6 at 17.]

On August 25, 2022, Mr. Walker wrote in a grievance that since August 23, 2022, his "breakfast, lunch, dinner trays were incorrect.  [He] reported it to staff who confirmed they were short but refused to replace trays saying 'it's Aramark's problem,' [and] on [August 25, 2022,] [he] reported to Sgt. Chris Simmerman that [the] tray was incorrect[, and] he told me he will not replace [the] tray but he would report that [the] tray was incorrect." [Filing No. 65 at 108.] He elaborated to state that "[t]he floor ofc. Neff told [him] that that Sgt. C. Simmerman took photos of [the] tray & Sgt. Smith told [him] he E-mailed Aramark & the Warden after [he] explained . . . that this has been going on for awhile and that Lt. Holcomb had already tried to get Ar[a]mark to correct the

trays." [Filing No. 65 at 109.] He stated further that he had "lost 30 pounds d[ue] to not receiving the right amount of calories," and that he had "been reporting this to grievance officer[s]," yet "grievances [were] denied or not processed saying that portion[s] are monitored by Aramark & staff," "but all the [restricted housing] staff confirms every time that they know portions are incorrect but all refused to remedy [the] situation[.]" [Filing No. 65 at 109.] Mr. Walker explained that he considered his treatment to be "cruel & unusual punishment for being in lock-up so that I can continue to suffer physically, mentally, & emotionally while [prison] staff refuse to fix the issue or even address the issue[.]" [Filing No. 65 at 109.] He considered the incident on August 25, 2022, as more "proof that this issue has never been addressed and that portions are always short." [Filing No. 65 at 109.] He noted that "this is a continuing issue that has not been addressed," and that he had written to the Warden "Lt. Holcomb & Aramark, [but] no one has addressed this issue." [Filing No. 65 at 108.] He requested "correct portion[s] on trays so that [he would not] continue to lose weight and suffer from hunger pains, insomnia & mental & emotional distress[.]" [Filing No. 65 at 108.]

By August 26, 2022, Mr. Walker weighed 166 pounds, another decrease in weight. [Filing No. 51-8 at 23.]

On August 29, 2022, Grievance Specialist Crichfield responded that "[f]ood quantity was addressed previously . . . . All trays are made using the same measuring tools. Aramark staff supervise the line making the trays. Just because you believe the trays are short, does not mean that they are. Staff are serving the menu approved by an appointed dietitian from Central Office." [Filing No. 65 at 103.]

By September 22, 2022, Mr. Walker weighed 165 pounds. [Filing No. 51-8 at 14.] The note documenting a medical visit that day states that Mr. Walker was experiencing "25 lbs. of

weight loss that has been unintentional," and ordered that he be weighed bi-monthly for three months because of an "abnormal loss of weight." [Filing No. 51-8 at 14-15.] During that appointment with medical personnel, the reporting nurse indicated that Mr. Walker was not underweight and that Mr. Walker stated "he does not exercise often and eats everything on his tray but has fatigue and insomnia." [Filing No. 51-8 at 18.]

By October 4, 2022, Mr. Walker weighed 164.5 pounds. [Filing No. 51-8 at 12.] And by October 18, 2022, he weighed 161 pounds. [Filing No. 51-8 at 10.]

### F.    A Prison Official Escalates the Food Issue and the Warden Intervenes

On October 20, 2022, IDOC employee Mark D. Hunt sent pictures of inadequate food trays to Lt. Holcomb, Food Service Manager Butler, and the Warden, noting the discrepancy between the sample trays and some actual trays:



[Filing No. 65 at 193-194 (the left shows some sample food trays, and the right shows some actual food trays).]

Mr. Hunt stated that this discrepancy affected "all the lunch trays" and that:

14

> These pictures show the difference between the sample trays and the trays that we are expected to serve in the SCU. This is an ongoing issue that sometimes gets corrected for a week or so and then goes right back to the same thing again. We work in an area where the offenders get no commissary and rely solely on the food they receive from PK. This has become a safety issue for the staff who work on the unit.

[Filing No. 65 at 190.] Drawing the inference in favor of Mr. Walker, the "safety issue for the staff" supports a reasonable inference that insufficient food was a persistent enough occurrence that it stirred up conflict between staff and other inmates; this message is similar to the one the Warden received about insufficient food in February 2022, which stated "it causes major issues between staff and offenders." [Filing No. 65 at 191.] Food Service Manager Butler stated that he would "follow up with this issue." [Filing No. 65 at 190.]

The Warden acknowledges in his affidavit that "there was a several-week period in or around October of 2022 when [the prison] experienced the most significant and frequent problems with trays containing underserved portions." [Filing No. 51-2 at 8.] Although IDOC employee Hunt stated that the discrepancy affected all the lunch trays, the Warden maintains that "[d]uring that timeframe [he] estimate[s] that there were likely fewer than ten (10) instances of individual inmates being served reduced portions." [Filing No. 51-2 at 8.] Nonetheless, based on "staff reports of inmate meal tray issues in or around October of 2022, [the Warden] personally contacted an official at Aramark to develop a quality control plan to investigate and prevent any food tray portioning issues." [Filing No. 51-2 at 8.] He states that "after . . . interventions were implemented," "there were very few instances of tray portioning issues." [Filing No. 51-2 at 9.]

Prior to this point, The Warden states that he "did not find evidence of a frequent or large-scale problem with inmates receiving insufficient food trays" and that inmates were "fabricating and/or falsely reporting issues with their food trays to try to obtain additional meal items and/or to express their displeasure with [restricted housing unit] commissary and/or property restrictions."

[Filing No. 51-2 at 6-7.] He indicates that inmates would be motivated to fabricate complaints because inmates in restricted housing "were prohibited from buying commissary food or drink items," and staff reports indicated that "inmates would alter their trays to make them appear deficient." [Filing No. 51-2 at 7.] He specifically disclaims any knowledge of Mr. Walker's "alleged weight loss, foodborne illness, or any other physical or mental issues or symptoms [Mr. Walker] allegedly experienced due to his receipt of incorrect food trays," and "never had any reason to believe that [Mr. Walker] was being served insufficient meal items." [Filing No. 51-2 at 9.]

Less than a month after the Warden intervened in the food-tray portions issue, on November 1, 2022, Mr. Walker gained weight and weighed 176 pounds, over ten pounds heavier than his October weigh-in. [Filing No. 51-8 at 8.]

### G.    Mr. Walker Continues to Receive Inadequate Food and Loses Weight Again

As of November 15, 2022, Mr. Walker had lost weight again, weighing in at 169 pounds. [Filing No. 51-8 at 6.] On November 23, 2022, Mr. Walker filed a grievance stating that on November 18, 2022, his "lunch tray portions were short & [he] didn't have any cornbread on [his] tray[.]" [Filing No. 65 at 110.] He informed an officer, who told him there was nothing that could be done because "all the trays didn't have cornbread." [Filing No. 65 at 110.] Mr. Walker believed this to be another instance when he was being "depriv[ed] of [his] daily calories," "causing [him] to suffer weight loss & emotional distress." [Filing No. 65 at 110.] In the grievance, Mr. Walker requested "to have correct portions & food items on trays, [and] for Aramark & [the Warden] to be made aware of [the] situation." [Filing No. 65 at 110.]

As of December 13, 2022, Mr. Walker weighed 170 pounds, approximately the same as in November. [Filing No. 51-8 at 2.] On December 18, 2022, Mr. Walker filed another grievance, stating again that portion sizes were incorrect. [Filing No. 51-6 at 53.] On December 21, 2022,

Grievance Specialist Crichfield responded to the cornbread grievance and stated that "[t]his issue is being addressed." [Filing No. 51-6 at 64.]  Food Service Manager Butler added that "[t]he issue . . . will be looked at and fixed." [Filing No. 51-6 at 64.]

On December 21, 2022, Mr. Walker wrote a request for an interview to Lt. Holcomb stating that "the food trays are always short or missing portions and when staff is notified they refuse to order new trays or missing portion[s, ] causing me to suffer severe weight loss, fatigue, abdominal pain, [and] mental distress.  [F]ood is being used [as] a corp[oral] punishment because you are aware of incidents [but] don't [do] nothing [a]bout it." [Filing No. 65 at 137.]  Also on December 21, 2022, Mr. Walker wrote in an informal grievance that on that same day, there was no fruit on the breakfast trays, and that he was not receiving 2500 to 2800 daily calories, "causin[g] abdominal pain, fatigue, dizziness, [and] mental distress." [Filing No. 65 at 128.]  The next month, on December 21, 2022, Grievance Specialist Crichfield forwarded to Mr. Walker a message from Food Service Manager Butler, who addressed the November 18 incident and stated that "[t]he [i]ssues that have been brought f[o]rth will be looked at and fixed." [Filing No. 65 at 111-112.] Grievance Specialist Crichfield considered the "Grievance resolved." [Filing No. 65 at 111-112.] A little over a week later, on December 30, 2022, Mr. Walker appealed, stating that "[t]his issue has never been fixed and is a constant issue[.]  The food trays are consistently short [and] missing items." [Filing No. 65 at 114.]  He stated that every time "it's brought to the attention of staff they refuse to call and order new trays or missing portions[.]  This has caused [him] & others severe health problems[.]  [He has] lost over 30 pounds due to not receiving 2500 to 2800 calories." [Filing No. 65 at 114.]  His December 21 grievance was rejected the next month on January 3, 2023, stating "this has been addressed many times." [Filing No. 65 at 130 (all-capital letters removed).]

Less than a week later, Mr. Walker appealed and stated that "[t]his issue has never been addressed due to the fact that fruit is constantly missing off breakfast trays and not replaced by Aramark. Also, trays are constantly short or missing portions and IDOC refuse[s] to call Aramark to have portions corrected or items replaced that are missing causing [him] to lose weight and suffer both physical and mental health problems." [Filing No. 65 at 132.] This appeal, too, was rejected with the note that "all trays are prepared the same regardless of what unit they are being sent to. APPEAL DENIED." [Filing No. 65 at 132.]

Reflecting on the grievance process and Grievance Manager Wellington and Grievance Specialist Crichfield, Mr. Walker states that "your grievance [doesn't] get processed because you said something this way," and they just created "a whole runaround . . . without actually fixing the issue at hand." [Filing No. 51-1 at 88.] Mr. Walker states as an example that if he were to write "a grievance and sa[y] that [his] food tray has been short for the past month," the grievance would be denied because he filed the grievance outside of the timeframe of the acts described in the grievance even though it was a "continuous violation." [Filing No. 51-1 at 89.] According to Mr. Walker, Grievance Specialist Crichfield and Grievance Manager Wellington would "nitpick[] with your grievance to make it seem like you're grieving an incident that happened three weeks ago, and in all reality, you're grieving about an incident that's happening right now that's just been going on for three weeks." [Filing No. 51-1 at 90-91.] Mr. Walker considers the grievance process to be a sham because "nothing you grieve about ever gets fixed in the grievance process," so it was simply a "bottomless" filing of grievances. [Filing No. 51-1 at 91-92.] Whenever Mr. Walker would receive responses to his grievances, they would come from Grievance Specialist Crichfield, and he believes that whenever a grievance was forwarded to another prison official, it could be sent "directly to [Food Service Manager] Butler," "straight to Aramark," "sent to [Warden]

Vanihel," "sent to [Lt.] Holcomb," or sent to whoever was related to what the "grievance [was] really about." [Filing No. 51-1 at 93-94.] Outside of the written back-and-forth of the grievance process, Mr. Walker never had "any other communication" about food with Grievance Manager Wellington or Grievance Specialist Crichfield. [Filing No. 51-1 at 95.] Mr. Walker believes that neither of them made any attempt "to remediate the situation" and even "block[ed] the issue from being remediated every time they refused to process the grievance, based off something that wasn't even [IDOC] policy." [Filing No. 51-1 at 95-96.] Mr. Walker notes, though, that in some instances, the grievance handlers did respond to a grievance with "responses from Aramark, Butler, Holcomb, and Vanihel." [Filing No. 51-1 at 97.] Besides "forwarding [the grievances] on to Aramark, Holcomb and Vanihel," he believes "that's all they should have done." [Filing No. 51-1 at 96-97.]

Overall, Mr. Walker's weight during this timeframe ranged from a high of 195 to a low of 161 pounds. [Filing No. 1-1 at 30 (195 pounds); Filing No. 51-8 at 10 (161 pounds).] After October 2022, which is when the Warden allegedly corrected food service issues, Mr. Walker's weight rose to 176 pounds. [Filing No. 51-8 at 8.] After that, though, by December 2022, Mr. Walker's weight dropped again to 170 pounds. [Filing No. 51-8 at 2.]

### H.    Mr. Walker Experiences a Mental Health Crisis

On January 30, 2023, Mr. Walker requested a mental health evaluation because he kept "hearing voices & seeing things" and felt that staff members were trying to kill him for filing lawsuits. [Filing No. 62-1 at 46.] On February 5, 2023, he filed another request for mental health care, stating that he was "having sever[e] suicidal thoughts [and he] can't deal with [his] depression and hearing voices & seeing visions" and that certain people, including the Warden and Officer Jobe, were "sending demons to try to kill [him]." [Filing No. 62-1 at 47.] He stated that he had "plans" to commit suicide. [Filing No. 62-1 at 47.] Three days later, he filed another request for mental health care, stating that he was "tired of dealing with [his] symptoms on [his] own & staff

keeps retaliating against [him] for lawsuits" and that he planned to kill himself if someone did not help him.  [Filing No. 62-1 at 48.]  Health care staff visited him at his cell, at which point Mr. Walker stated that he was fine.  [Filing No. 62-1 at 48.]

Nonetheless, Mr. Walker states that "the psychological damage" from "not being properly fed" is "one of the reasons related to [him] harming [himself] in the beginning of 2023."  [Filing No. 51-1 at 27.]

### I.    Mr. Walker's Interactions With Certain Defendants

During the time Mr. Walker allegedly received inadequate food, he had contact with most of the Defendants.  He describes in his deposition receiving food from several officers but does not provide exact dates.  Instead, he has narrated interactions with Defendants generally as summarized below.

#### 1.    Officer Jobe

In Mr. Walker's deposition, he testified that he "kept finding – and showing [Officer Jobe] that [he] had – . . . brown hair in [his] food, which [Mr. Walker] believed to be [Officer Jobe's] at the time."  [Filing No. 51-1 at 82-83.]  Mr. Walker stated that "a lot of times pertaining to [Officer Jobe] giving [Mr. Walker] food trays when [Mr. Walker] would try and get them swapped out, [Officer Jobe] would refer to [Mr. Walker] as a homosexual or a snitch . . . to try to encourage other inmates to try to do something to [Mr. Walker] for a tray."  [Filing No. 51-1 at 83.][3]

---

[3] The Court observes that in the opening brief, Officer Jobe argues only the First Amendment claim against him, not the Eighth Amendment claim.  [Filing No. 57 at 24 (citing Defendants Simmerman, Neff, Arnold, Smith, and Holcomb, but not Officer Jobe.]  Officer Jobe's reply includes his Eight Amendment argument.  [Filing No. 67 at 9.]  The Court, in its discretion, considers Officer Jobe's omission to be unintentional and will consider his arguments on the merits.

2.    *Lieutenant Holcomb*

Mr. Walker noted in his deposition that Lieutenant Holcomb was "a shift supervisor" in restricted housing so "most of the decision-making to not order the new trays went directly through [Lieutenant] Holcomb," and that Lieutenant Holcomb informed Mr. Walker and other inmates that Lieutenant Holcomb had "complained to Aramark."    [Filing No. 51-1 at 41.]    Mr. Walker emphasized that Lieutenant Holcomb "made that final decision as to whether to call and get more trays" to replace trays that did not have enough food.    [Filing No. 51-1 at 41-42.]    Mr. Walker stated that Lieutenant Holcomb would "give us this spiel about, okay, all the trays are like this, all the trays are short, I took pictures of the trays, I told Aramark a thousand times to send the new trays over here."    [Filing No. 51-1 at 70.]    He stated that Lieutenant Holcomb told him and other inmates that "he tried – he sent pictures over to Aramark and he complained about it, he let [Warden] Vanihel know, and basically the same" problems remained.    [Filing No. 51-1 at 75.]

To Mr. Walker's understanding, inmates had "a right to request to speak to the superiors," so given that Lt. Holcomb was "the highest ranking custody officer in lockup . . . he [was] supposed to make himself available to [inmates] once a day."    [Filing No. 51-1 at 78.]    The challenge, however, was that inmates would not see Lt. Holcomb "95 percent of the time" because "he hardly ever walks through," was dealing with "so many other [inmates] trying to speak to him and argue about the same thing," or he had actually been present but "refused to speak to" Mr. Walker.    [Filing No. 51-1 at 78-79.]

Mr. Walker noted that "out of most of the [D]efendants, . . . he was one of the main ones that used to admit that he knew the trays were inadequate" and "that he was the one who was trying to fix it."    [Filing No. 51-1 at 75-76.]    Nonetheless, Mr. Walker stated that Lieutenant Holcomb "did everything besides order the new trays and send them."    [Filing No. 51-1 at 70.]

### 3. Sergeant Simmerman

In one of Mr. Walker's grievances, he stated that from August 23 to August 25, 2022, his "breakfast, lunch, [and] dinner trays were incorrect. . . . [H]e reported to Sgt. Chris Simmerman that [the] tray was incorrect[.] [H]e told me he will not replace [the] tray but he would report that [the] tray was incorrect." [Filing No. 51-6 at 27.]  Mr. Walker noted that Sgt. Simmerman took photos of the tray.  [Filing No. 51-6 at 28.]  In Mr. Walker's deposition, he stated that Sergeant Simmerman "on multiple occasions . . . had refused to replace [his] trays out of retaliation for" filing grievances against Officer Jobe and another officer.  [Filing No. 51-1 at 80-81.]  Mr. Walker stated further that "[o]n multiple occasions" he saw Officer Simmerman give other inmates extra trays to convince them "to throw body fluids" at Mr. Walker.  [Filing No. 51-1 at 81.]  According to Mr. Walker, Officer Simmerman specifically told him that he would "mess with [him] because [he] told on [Officer Simmerman's] brothers," and agreed that Officer Simmerman "explicitly express[ed] that it was because of [his] complaints and lawsuits."  [Filing No. 51-1 at 81-82.][4]

### 4. Sergeant Smith

In one of Mr. Walker's grievances, he stated that Sergeant Smith told Mr. Walker that Sergeant Smith e-mailed Aramark and the Warden "after [Mr. Walker] explained to [Sergeant Smith] that this has been going on for awhile and that Lt. Holcomb had already tried to get Aramark to correct the trays.  I have lost 30 pounds due to not receiving the right amount of calories." [Filing No. 51-6 at 28.]  Mr. Walker stated that although Sergeant Smith did not "do so out of retaliation," Sergeant Smith nonetheless had "refus[ed] to replace [his] tray and just [told] [Mr. Walker] that he wasn't going to do it."  [Filing No. 51-1 at 82.]

---

[4] The Court notes that there is no First Amendment retaliation claim against Sergeant Simmerman. The Court considers his allegedly retaliatory conduct only as evidence relevant to deliberate indifference.

5.    *Officer Neff*

In one of Mr. Walker's grievances, he stated that during the same incident Sergeant Simmerman took a photo of the tray, and "the floor Ofc. Neff" informed Mr. Walker that Sergeant Simmerman had done so.  [Filing No. 51-6 at 28.]  In Mr. Walker's deposition, he testified that once "there was something missing on [his] breakfast tray and [Officer Neff] refused to replace the tray.  [Officer Neff] also refused to give [Mr. Walker] apple juice and coffee . . . .  Then he told [Mr. Walker] to just take the tray.  Then once [Mr. Walker] took the tray, [Officer Neff] refused to give [Mr. Walker] the coffee and drink, because . . . he refused to let [Mr. Walker] speak with Lieutenant Holcomb."  [Filing No. 51-1 at 48.]  Officer Neff once also told Mr. Walker that "all the trays smelled like that and refus[ed] to replace the tray."  [Filing No. 51-1 at 87.]

6.    *Officer Arnold*

In Mr. Walker's deposition, he testified that he "remember[s] [Officer] Arnold refusing to swap [his] tray out."  [Filing No. 51-1 at 83.]

7.    *The Warden*

Mr. Walker typically did not directly communicate with the Warden, only speaking with him "personally in passing maybe a couple times."  [Filing No. 51-1 at 72.]  Most communication, Mr. Walker believes, was in the form of his grievances.  [Filing No. 51-1 at 72-73.]  He states that the Warden "is one of the people that responded to the grievance, [and] that he was monitoring the trays and he was ensuring the trays were being adequately made and they weren't."  [Filing No. 51-1 at 39.]  But he doesn't remember the date of the grievance that the Warden responded to. [Filing No. 51-1 at 39.]  He states that "[t]here were multiple grievances, so that was the issue for the [W]arden to go to the kitchen and monitor the trays, which he doesn't naturally do."  [Filing No. 51-1 at 40.]

### 8. Food Service Manager Butler and Aramark

Although they have "never personally met," Mr. Walker believe that Food Service Manager Butler was one of the individuals who "responded to the grievance [stating] that the trays were being made correct and that he was monitoring the trays." [Filing No. 51-1 at 29.] He noted that he had no "direct contact with Aramark . . . . [and that] all [his] concerns and problems would be basically through a report . . . about [him] complaining to staff. . . . [He] would have no way of virtually contacting them." [Filing No. 51-1 at 17.]

### 9. Grievance Specialist Crichfield and Grievance Manager Wellington

Mr. Walker states that he did not have any direct contact with Grievance Specialist Crichfield or Grievance Manager Wellington outside of the written grievance process. [Filing No. 51-1 at 95.]

### J. Mr. Walker Describes the Food Issue as Systemic

Mr. Walker states that "every day of the week something was missing off [his] tray." [Filing No. 51-1 at 88.] Sometimes, it was not just incorrect portions, but meals also were "missing portions" like "a slice of bread," "missing . . . cake," "only one hot dog," or "no hamburger patty." [Filing No. 51-1 at 64.] According to Mr. Walker, "it wasn't an unknown issue. . . . It happen[ed] all the time. . . . It [was] systemic." [Filing No. 51-1 at 63.] "[T]he whole entire SHU . . . was dealing with the exact same thing." [Filing No. 51-1 at 103.] He notes that "everybody was losing vast amounts of weight." [Filing No. 51-1 at 104.] Other inmates, according to Mr. Walker, would try to force attention to the food issue by "set[ting] fires," "flood[ing] their cells out," and "banging on doors." [Filing No. 51-1 at 70.] It was not just Mr. Walker's tray; "this was everybody's tray, so everybody was complaining." [Filing No. 51-1 at 62.]

Mr. Walker has submitted the affidavits of many other inmates, who each have attested to nearly identical complaints stating, for example, that prison officials "repeatedly refused to address

24

or fix the systematic food deprivation in the SCU after they were all made aware of the issue by [Mr.] Walker, myself and others which led to myself, [Mr.] Walker and others to suffer massive weight loss and health issues." [Filing No. 65 at 250-51 (affidavit of Chris Gregory); *see also* Filing No. 65 at 249 (affidavit of Darius Printup); Filing No. 65 at 247-48 (affidavit of Xane Hively); Filing No. 65 at 231 (affidavit of Dianta Williams); Filing No. 65 at 232 (affidavit of Mark Shepherd); Filing No. 65 at 233 (affidavit of Michael Hickingbottom); Filing No. 65 at 234 (affidavit of James Denning); Filing No. 65 at 235 (affidavit of Markese Garrett); Filing No. 65 at 237 (affidavit of Jordan Mathis); Filing No. 65 at 243 (affidavit of Rashaad Hogan).] Such additional health issues included "pain, fatigue, [and] dizziness." [Filing No. 65 at 238.][5]

Mr. Walker states that despite these complaints, the correctional officers would tell inmates "it is what it is" and would only "take a picture of the tray and send it to Aramark." [Filing No. 51-1 at 62.] Mr. Walker would talk to a corrections officer, who would say, "[W]ell, I checked the tray and [the food] was on there," to which Mr. Walker would reply, "[Y]ou couldn't have checked it, because if you would've checked it, you would have seen it wasn't on there." [Filing No. 51-1 at 64-65.] Sometimes, "they might swap your tray out with another tray they got down there." [Filing No. 51-1 at 65.] But frequently, the correctional officer would typically hand the tray to an inmate and "walk away." [Filing No. 51-1 at 65.] Mr. Walker has received food trays from the Officer Defendants, all of whom "would tell [him] beforehand" at least "once or twice" that the trays were short. [Filing No. 51-1 at 68-69.] But whenever Mr. Walker did receive replacement trays, he states that it was "[n]ot from any of the [D]efendants." [Filing No. 51-1 at 67.]

---

[5] While many of these statements are labeled as "declarations," "[b]y declaring under penalty of perjury that the [declaration] was true," each declaration was converted "into an affidavit." *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004).

To Mr. Walker's knowledge, none of the Defendants "took any steps to actually remediate any situations," even though "all it would have ever [taken] was for them to just call and order a tray." [Filing No. 51-1 at 83.] Mr. Walker states that if an Officer would simply "call and order the trays, the person they call on the other end of the phone had no right to refuse it." [Filing No. 51-1 at 84.] But "[n]obody wanted to send them back to Aramark so they could remake them and nobody wanted to repass the trays out." [Filing No. 51-1 at 15.]

### III.
#### PROCEDURAL BACKGROUND

On April 3, 2023, Mr. Walker filed suit against the Defendants, claiming, among other things, that they violated his Eighth Amendment right to be free from cruel and unusual punishment by denying him food, and also that Officer Jobe violated his First Amendment right to be free from retaliation. [Filing No. 1 at 3-4.] The Court screened his Complaint, leaving the claims now at issue on summary judgment. [Filing No. 13 at 3.] Relevant to the remaining claims in this case, Mr. Walker proceeds with claims "that he has received insufficient and sometimes spoiled meals" against all Defendants under the Eighth Amendment, including a *Monell* claim against Aramark, and that Officer Jobe "retaliated against him by tampering with his food" in violation of the First Amendment. [Filing No. 13 at 3.]

Aramark and Food Service Manager Butler have filed a Motion for Summary Judgment. [Filing No. 46.] And the Warden, the Officer Defendants, Grievance Manager Thomas Wellington, and Grievance Specialist Shelby Crichfield have jointly filed their own Motion for Summary Judgment. [Filing No. 50.] Both Motions are ripe for the Court's consideration.

# IV.

## DISCUSSION

### A.    Eighth Amendment Violation due to Inadequate Food

There are numerous Defendants who assert multiple arguments based on lengthy facts.  To orient the analysis, the Court sets forth the key questions for a claim of deliberate indifference to a prisoner's conditions of confinement in violation of the Eighth Amendment.

The first issue to be resolved is whether Mr. Walker faced objectively serious prison conditions and whether there is a causal link between those conditions and a cognizable injury. This issue applies to all Defendants, so it will be analyzed collectively.

The second set of issues involves each Defendant's mental state, actions, and inactions, and so applies to each Defendant individually.  The Court will determine if there is a genuine and material factual dispute over whether each Defendant was personally responsible for the constitutional violation, whether each Defendant was deliberately indifferent to the risk of harm to Mr. Walker; and finally, whether each Defendant responded reasonably to that risk even if the harm was ultimately not averted. .

#### 1.    *Objectively Serious Prison Conditions*

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  The ultimate question is whether the condition is "sufficiently serious" so as to deny the inmate "the minimal civilized measure of life's necessities," *Thomas*, 2 F.4th at 716, thereby creating "an excessive risk to [the inmate's] health and safety." *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019).

The Aramark Defendants argue that Mr. Walker's prison conditions were not objectively serious.  [Filing No. 47 at 12.]  They present evidence that the meals provided were nutritionally

adequate, meeting the caloric and nutritional requirements set by the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences, and Aramark's registered dietician. [Filing No. 47 at 12.] They assert that the meals provided approximately 2500-2800 calories daily, along with consistent amounts of protein and healthy levels of vitamin A, vitamin C, calcium, and iron. [Filing No. 47 at 12.] They note that Mr. Walker's weight remained within a healthy body-mass-index range during the relevant period, with no medical evidence indicating concern about his weight. [Filing No. 47 at 13-14.] Furthermore, they state that any issues with spoiled food were infrequent and that a Tray Replacement Policy was available to address such issues. [Filing No. 47 at 16.] Overall, the Aramark Defendants assert that Mr. Walker did not suffer a deprivation that was objectively, sufficiently serious.

The Corrections Defendants' arguments echo those of the Aramark Defendants. They aver that Mr. Walker's food deprivations were not "objectively serious." [Filing No. 57 at 20-21.] They state that out of 21 meals per week, only 1 to 4 meals were deficient, and the deficiencies were minor, such as missing a piece of fruit or receiving a half portion of a starch. [Filing No. 57 at 21.] As to Mr. Walker's weight loss, they state that "at 165 pounds . . . [Mr. Walker] was not underweight" and he was never diagnosed with any "injury or illness as a result of this weight loss or [his] allegedly inadequate meals." [Filing No. 57 at 23.]

Mr. Walker responds that because of inadequate food portions, he experienced not only weight loss, but also "fatigue, stomach pains, dizziness, and mental health issues." [Filing No. 65 at 24.] He states that medical staff told him his weight loss was due to not receiving adequate daily calories. [Filing No. 65 at 10.] He states that the issues were "not being remediated by anyone," and "would be fixed for a few days then go back to the same thing." [Filing No. 65 at 23.] He notes that a prison official sent an email describing an "ongoing" issue that food portions were

missing compared to the sample trays, which caused "safety" issues in restricted housing. [Filing No. 65 at 23.]

The Aramark Defendants reply that "[t]he Constitution does not guarantee food that is prepared and served in a culinary pleasing manner." [Filing No. 69 at 6-7.] And they argue that Mr. Walker "still has not proffered any testimony from a dietician or medical professional, or even a lay opinion other than his own, that [he was] not provided with a nutritionally adequate diet or that the diet caused his alleged injury." [Filing No. 69 at 7.] They state that Mr. Walker's injury was supposedly weight loss, but "he always fell within a healthy BMI for his height and weight," and "his medical records contain no mention of weight loss due to an inadequate diet." [Filing No. 69 at 10-11.]

The Corrections Defendants reply that the "bad fruit," "spoiled chili," "reduced starch portion sizes," "omission of one breakfast serving of fruit," and other "food quality complaints" "were minor deprivations in terms of extent, duration, and consequences." [Filing No. 67 at 1-3.] They argue that Mr. Walker received bad fruit "maybe 20 times or less" and bad chili only once over two years in restricted housing. [Filing No. 67 at 2.] They argue that Mr. Walker "made no attempt to evidence the frequency in which he purportedly received reduced portion sizes," and the "staff made no representations regarding the number of times the issue had occurred, nor did they indicate that this issue persisted at any other point besides the weeks in or around October of 2022." [Filing No. 67 at 3-4.] They aver that "even if there was some level of a recuring issue with meal tray portioning, that would not [be] per se evidence that [Mr. Walker] was repeatedly fed diminished portions." [Filing No. 67 at 4.]

As the Seventh Circuit has explained, "[p]rison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment."

*Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). "'[R]estrictive' and 'uncomfortable' conditions are not sufficient to prove an Eighth Amendment violation." *Seventh Circuit Pattern Civil Jury Instructions* 174 cmt. c (7th Cir. 2017) (citations omitted). Indeed, "the deprivation alleged must be, objectively, 'sufficiently serious,' . . . result[ing] in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (citation omitted). "An adverse condition of confinement, if endured over a significant time, can become an Eighth Amendment violation even if it would not be impermissible if it were only a short-term problem." *Gray*, 826 F.3d 1000, 1005 (7th Cir. 2016). And "physical injury need not result for the punishment to state a cause of action," under the Eighth Amendment "for the wanton infliction of psychological pain is also prohibited." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). Between permissible and impermissible conditions of confinement, the question is "[w]hether the plaintiff's claim" is "something more akin to an annoyance than to oppression." *Powers v. Snyder*, 484 F.3d 929, 933 (7th Cir. 2007).

As it pertains to food, the Supreme Court has held that a prison's "condition[s] of confinement" include the "food [a prisoner] is fed." *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Prison officials, therefore, "must ensure that inmates receive adequate food." *Farmer*, 511 U.S. at 832. "[D]enial of food," "in cases in which it inflicts serious harm on the prisoner," violates the Eighth Amendment. *Freeman v. Berge*, 441 F.3d 543, 544 (7th Cir. 2006). Such unconstitutional denials of food can include "not just ran[c]id food, but also a 'nutritionally deficient' diet." *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). That means a diet consisting of "meals deficient enough to pose a substantial risk of serious harm, as determined by the objective test of *Farmer*." *Williams v. Shah*, 927 F.3d 476, 480 n.3 (7th Cir. 2019). To assess whether a nutritionally deficient diet meets *Farmer's* objective test, a "court must assess the amount and duration of the deprivation, . . . as well as the medical condition of the inmate." *Id.* (quoting *Reed v. McBride*,

178 F.3d 849, 853 (7th Cir. 1999)).  For example, if "the plaintiff was already infirm, . . . an alleged deprivation of food could possibly have more severe repercussions for him than a prisoner in good health."  *Reed*, 178 F.3d at 853-54.

a.    Bad Batches of Food

Mr. Walker notes a handful of instances of distasteful and/or spoiled food, including a bad batch of chili and fruit that was bad or old approximately 20 times over multiple years.  While such food might have been distasteful, appetizing cuisine is not the constitutional standard.  The food must be merely "adequate," not "appetizing."  *Williams v. Berge*, 102 F. App'x 506, 507 (7th Cir. 2004) (citations omitted).  "While inmates have a right to a nutritionally adequate diet, they have no constitutional right to be served a particular type of meal."  *McKinley v. Murphy*, 974 F.2d 1340 (7th Cir. 1992) (citation omitted).  "A well-balanced meal, containing sufficient nutritional value to preserve health, is all that is required."  *Lunsford*, 17 F.3d 1574 at 1580 (citation omitted).  While unappetizing, these food incidents fall short of the "deliberate . . . substitution of tainted or otherwise sickening food."  *Prude v. Clarke*, 675 F.3d 732, 734 (7th Cir. 2012).  Instead, these food incidents fall more neatly into food servings that were only tolerably distasteful or sporadically inedible, which do not violate the Eighth Amendment.  *See, e.g.*, *Lunsford*, 17 F.3d at 1578, 1580 (citation omitted) (ruling against prisoner and holding that "cold, poorly-prepared beans" did not violate the Eighth Amendment); *Williams*, 102 F. App'x at 507 (citation omitted) (ruling against prisoner and holding that "stale raisins and peanut butter, along with other food," did not violate the Eighth Amendment); *Franklin v. McCaughtry*, 110 F. App'x 715, 718 (7th Cir. 2004) (affirming summary judgment against prisoner and holding that "hairs on . . . food" did not violate the Eighth Amendment).

These bad batches of food were also served sporadically or for a short duration.  As the Defendants have noted, isolated incidents fall short of the more egregious violations that have run

afoul of the Eight Amendment such as total deprivation for days at a time.  *See, e.g.*, *Atkins v. City of Chicago*, 631 F.3d 823, 830 (7th Cir. 2011) (citing *Reed*, 178 F.3d 849, 853-54) (holding that "[d]epriving a person of food for four days would impose a constitutionally significant hardship"); *Reed*, 178 F.3d at 853 (ruling that the defendants denied him the "minimal civilized measure of life's necessities" by withholding food from him on many occasions for three to five days at a time).  All Defendants are entitled to summary judgment as to the various instances where Mr. Walker received bad batches of food.

> b.    Inadequate Diet

Isolated bad batches of food, however, do not end the analysis.  The Court's analysis must avoid permitting Defendants to "pick apart the individual components of [an inmate's] claim and to suggest that each one, alone, is not intolerable"; after all, an inmate "is entitled to have his complaint evaluated as a whole."  *Gray*, 826 F.3d at 1005.  Indeed, the Court can "examine the record upon summary judgment in its entirety."  *Vance v. Peters*, 97 F.3d 987, 994 (7th Cir. 1996).  Holistically considering Mr. Walker's claim, he has argued not only that he received bad food, but more significantly that he regularly did not receive enough food because his and other inmates' food trays fell short of Aramark's food policy.  He thus must prove "that inmates were being served nutritionally inadequate meals regardless of the requirements of the [food] program," so the Court evaluates that evidence.  *Shah*, 927 F.3d at 480.

In support of Mr. Walker's argument, he submits images comparing Aramark's sample food trays versus some of Aramark's actual food trays.  The left shows the sample food trays, and the right shows some actual food trays:



[Filing No. 65 at 193-194.]

While the images are not models of clarity, upon close scrutiny the Court is able to identify that the actual food trays do have materially less food than the sample food trays. At least one prison official agreed with that assessment; IDOC employee Mark D. Hunt sent these exact images to Officer Holcomb, Food Service Manager Butler, and the Warden, noting the discrepancy:

> These pictures show the difference between the sample trays and the trays that we are expected to serve in the SCU. This is an ongoing issue that sometimes gets corrected for a week or so and then goes right back to the same thing again. We work in an area where the offenders get no commissary and rely solely on the food they receive from PK. This has become a safety issue for the staff who work on the unit.

[Filing No. 65 at 190.]

While Mr. Hunt's concern may have been for the "safety issue for the staff" his email describes the inadequate food issue as "ongoing." Other inmates attest to the persistence of the problem, stating nearly identical affidavits that, for example, prison officials "repeatedly refused to address or fix the systematic food deprivation in the SCU after they were all made aware of the issue by [Mr.] Walker, myself and others which led to myself, [Mr.] Walker and others to suffer

massive weight loss and health issues." [Filing No. 65 at 250-51 (affidavit of Chris Gregory); *see also* Filing No. 65 at 249 (affidavit of Darius Printup); Filing No. 65 at 247-48 (affidavit of Xane Hively); Filing No. 65 at 231 (affidavit of Dianta Williams); Filing No. 65 at 232 (affidavit of Mark Shepherd); Filing No. 65 at 233 (affidavit of Michael Hickingbottom); Filing No. 65 at 234 (affidavit of James Denning); Filing No. 65 at 235 (affidavit of Markese Garrett); Filing No. 65 at 237 (affidavit of Jordan Mathis); Filing No. 65 at 243 (affidavit of Rashaad Hogan).]   Such additional health issues included "pain, fatigue, [and] dizziness."  [Filing No. 65 at 238.]  The foregoing evidence is sufficient to raise a fact issue as to whether "inmates were being served nutritionally inadequate meals regardless of the requirements of the [food] program."  *Shah,* F.3d 476 at 481.

Defendants further imply that even if the food servings were inadequate, Mr. Walker's weight – even with a 30-pound loss – remained within a healthy BMI.  [*See, e.g.*, Filing No. 47 at 13-14.]  At first blush, the law may seem to support their argument.  "[E]ven a 45-pound weight loss would not support a claim without evidence of serious suffering or lasting harm."  *Morris v. Kingston*, 368 F. App'x 686, 689 (7th Cir. 2010) (citing *Freeman*, 441 F.3d at 547) (affirming summary judgment against prisoner where prisoner missed 17 meals and lost weight but "he was examined five times by medical staff during his 24-day stay in segregation, and the staff noted no serious medical problem related to weight loss or otherwise caused by missing food").  And weight loss alone does not always cause constitutionally significant injury if the individual's final weight was healthy.  *See, e.g., Freeman,* 441 F.3d at 544, 547 (observing that "there [was] no indication that [the inmate's] life or health were jeopardized" since "he ended up closer to the normal weight for a person of his height than when he began," though that is not a "complete defense").  But Mr. Walker does not limit his claims to weight loss.  The injuries beyond weight loss – pain, insomnia,

fatigue, dizziness, migraines, hearing voices, ideations of suicide, and engaging in actual self-harm – are important for analyzing the objective seriousness of Mr. Walker's prison conditions.

The result of this analysis reveals a material dispute of fact.  While all Defendants make much of the Master Menu designed to provide a nutritionally adequate diet, a reasonable jury could find that "ongoing" departures downward from that food policy – of which Defendants were aware – resulted in a nutritionally deficient diet.[6]  A reasonable jury could also credit Mr. Walker and his affiants noting the ongoing food shortages and resultant complaints; the photograph revealing striking differences of the amount of food on a nutritionally adequate sample tray versus a distributed tray; along with recognition by an officer and the Warden of an ongoing food-portion shortage that was stirring up conflict between staff and inmates.  In short there is a genuine dispute of material fact over whether the amount of food was so insubstantial as to amount to be nutritionally deficient in violation of the Eighth Amendment and thus was objectively serious.

### 2.    *Causation for a Cognizable Harm*

A plaintiff "must do more than demonstrate a triable issue of fact with respect to the conditions he faces; he must also show that he suffered some cognizable harm" from the condition and that a defendant's "deliberate indifference caused that harm." *Gray*, 826 F.3d at 1006.  The assessment of causation usually follows an analysis of a defendant's subjective intent.  *See, e.g.,*

---

[6] Indeed, Mr. Walker's claims go beyond prior failed cases in this Court.  *See, e.g.*, *Hogan v. Vanihel*, No. 2:23-cv-00368-MPB-MKK at dkt. 45 (S.D. Ind., Feb. 13, 2024) (granting summary judgment to defendants on Eight Amendment food claim where prisoner "designated no evidence to support an inference that he was unable to request replacement trays when he received trays with inadequate portions").  And the Court finds that Mr. Walker's case is aligned with another previous prison-food case in this Court. *Blue v. Bedwell*, No. 2:21-cv-00315-JRS-MKK at dkt. 71 (S.D. Ind., Aug. 8, 2023) (denying Aramark Food Services Director's motion for summary judgment because there was a dispute of fact over whether he provided an inmate with "inadequate food portions").

*id.*  In this case, however, whether the food issue caused an alleged injury is a question that applies to all Defendants, so for the sake of analytical economy, the Court conducts this analysis before considering *Farmer*'s question of subjective intent.

"When assessing an Eighth Amendment claim, [a court] look[s] for physical injury 'that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.*  Since "this is a prison-conditions case, not a case about inadequate medical treatment" it is enough to show a worsening of one's condition without a far worse diagnosis.  *Id.* (holding that "[e]xcessive cold, for example, can also amount to an Eighth Amendment violation, even if the prisoner has not yet come down with the flu").  The Seventh Circuit has accordingly distinguished between its approach to questions of adequate medical treatment versus other prison conditions, like those regarding adequate food.  *Compare French v. Owens*, 777 F.2d 1250, 1254 (7th Cir. 1985) (separately evaluating "[m]edical [c]are"); *with id.* at 1255 (separately evaluating "safe, sanitary and nutritious food").

In this case, Mr. Walker argues that the unexpected weight loss caused him pain and worsened his mental health, including his depression.  He noted in at least one of his requests for medical assistance that he was hearing voices.  The Defendants note that his weight loss did not render him underweight and notes that Mr. Walker "is not a medical professional and has offered nothing beyond pure speculation to evidence that his weight loss, even if caused by the alleged meal deficiencies, was harmful to his physical health."  [Filing No. 57 at 23.]

For the purpose of showing a link between the lack of food and his injuries, "it surely would have been better if [Mr. Walker] had been able to locate a medical expert," but "the fact that he was unable to do so from prison does not in this situation spell the end of his case."  *Gray*, 826

F.3d at 1007.  At least in other contexts, the Seventh Circuit has evaluated circumstances where there was a connection between insomnia, weight loss, and depression.  *Valdivia v. Twp. High Sch. Dist. 214*, 942 F.3d 395, 398 (7th Cir. 2019) (observing that FMLA claimant's records indicated "insomnia, loss of appetite, weight loss" and "anxiety or depression, or both").  Unexpected weight loss and accompanying physical pain and worsening mental health symptoms pose a "common-sense link."  *Gray*, 826 F.3d at 1007.  It is also common sense that if a person consumes fewer calories than he burns, he will lose weight.  Thus, it is a question of fact whether Mr. Walker was served inadequate portions or whether he was simply not eating all of the food on his tray, or was exercising and burned more calories, or had some other ailment.  *Cf. Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011) (holding that "if weight loss and temporary discomfort are the only consequences of refusing to eat, then the inmate's choice to go on a hunger strike raises no Eighth Amendment concern").[7]  The Defendants are not entitled to summary judgment on the grounds that Mr. Walker did not suffer from an objectively serious condition that caused him harm.

    3.    *Personal Responsibility, Deliberate Indifference, and Reasonable Response*

For each Defendant, the Court proceeds to analyze three additionally necessary components to establish liability for an Eighth Amendment violation: (1) personal responsibility, (2) deliberate indifference, and (3) reasonable response.  A defendant must be "personally responsible for the deprivation of a constitutional right," or else a plaintiff cannot "recover damages under § 1983."  *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)).  To demonstrate "deliberate indifference," a prisoner must

---

[7] "[T]he Prison Litigation Reform Act, 42 U.S.C. § 1997e(e), bars prisoners from bringing a suit based only on mental or emotional injury," so "if the jury finds that [Mr. Walker] suffered only psychological harm, he will be limited to nominal and punitive damages."  *Gray*, 826 F.3d at 1008 (reversing summary judgment and instead ruling in prisoner's favor).

establish that a defendant had a culpable state of mind — that he was "subjectively aware of these conditions and refused to take steps to correct them." *Thomas*, 2 F.4th at 720. If a defendant "responded reasonably to the risk," he "may be found free from liability . . . even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844 (citation and quotation marks omitted). For this analysis, each Defendant is considered individually.

a.     <u>Grievance Specialist Shelby Crichfield</u>

Grievance Specialist Crichfield argues that Mr. Walker's grievances "were inadequate to put [her] on notice that [his] health and safety were seriously jeopardized by his recurrent meal service issues." [<u>Filing No. 57 at 31</u>.] She states that she "responded reasonably to [Mr. Walker's] food-related grievances." [<u>Filing No. 57 at 30</u>.] She states that "[i]n each instance wherein [Mr. Walker's] grievance was rejected but could be reprocessed . . . [he] was notified of the basis of the rejection and given the opportunity to refile. [<u>Filing No. 57 at 14</u>.] As to grievances that were not rejected, she either "denied the grievance" where there was "no evidence to support [Mr. Walker's] claim of receiving diminished portions of his meal items," and in response to one grievance, she "advised [Mr. Walker] . . . that [Food Service Manager] Butler would repeat his investigation and remedy any issues found." [<u>Filing No. 57 at 13-14</u>.] She points out that Mr. Walker "concedes that [she] did 'all [she] should have done' to pursue [his] complaints by forwarding his grievances to Aramark staff for investigation and a response, collecting and reporting their response in a formal first level grievance response, and rendering a decision based on the finding." [<u>Filing No. 57 at 13</u>.]

Mr. Walker responds generally that each Defendant "falsely and frivolously claim[s]" "no knowledge of the serious health risk . . . due to . . . continuously serving [Mr. Walker] inadequate food portions. [<u>Filing No. 65 at 26</u>.] He states that he and "other individuals have personally told these [D]efendants that the food deprivation caused him and other[s] serious health risk[s]."

[Filing No. 65 at 26.]  He argues that "Defendants themselves have e-mailed each other due to the 'safety' hazard in SCU that serving incarcerated individuals insufficient trays caused." [Filing No. 65 at 26.]  Mr. Walker avers that "[c]ommon sense dictates that there is obviously danger in continuously and repeatedly serving individuals inadequate food portions or food portion[s] that are missing altogether." [Filing No. 65 at 27.]  And he states that the Defendants "had direct knowledge of [his] particular deprivations and of the systematic issue with the meal tray adequacy in SCU," noting that he and other inmates "filed multiple grievances related to the food deprivation issues." [Filing No. 65 at 29.]

Grievance Specialist Crichfield reiterates that she "forwarded [Mr. Walker's] meal tray grievances to Aramark staff for a response and rendered a determination based on the investigation and returned and rejected any grievances that failed to comply with the grievance policy." [Filing No. 67 at 12.]  She states that in doing so, she "responded reasonably." [Filing No. 67 at 12.]

As the Seventh Circuit has explained, it is often prudent to "first eliminate those claims against . . . officials that" "cannot stand," and this applies to Grievance Specialist Shelby Crichfield on the basis of personal responsibility. *Antonelli*, 81 F.3d at 1428.  A person is personally responsible only if she "cause[s] or participate[s] in the violation[]." *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007).  "Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation." *Id.* (observing that rejecting "an administrative complaint about a completed act of misconduct does not" violate the constitution).  The record shows that Grievance Specialist Crichfield's only involvement, if any, was at worst her callous and erroneous rejections and denials of Mr. Walker's grievances.  But "the alleged mishandling of [a plaintiff's] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim."

*Owens*, 635 F.3d at 953. Mr. Walker has presented no evidence that Grievance Specialist Shelby Crichfield caused or participated in the underlying conduct.

Consequently, the Court **GRANTS** the Motion for Summary Judgment as to Mr. Walker's Eighth Amendment claims against Grievance Specialist Shelby Crichfield.

b.    <u>Grievance Manager Thomas Wellington</u>

Grievance Manager Wellington's argument is the same as Grievance Specialist Crichfield's, that Mr. Walker's grievances were not enough to put him on notice that Mr. Walker experienced a serious risk of harm. [Filing No. 57 at 31.] He states further that he responded reasonably to Mr. Walker's grievances by denying those that were non-compliant with policy and responding to other grievances by forwarding them to other individuals for investigation. [*See* Filing No. 57 at 30-31.]

Mr. Walker's response to Grievance Manager Wellington is his same general response to all Defendants, that he knew of a serious food problem, disregarded resultant health risks, and failed to remediate even after he filed grievances. [*See* Filing No. 65 at 26-29.]

Grievance Manager Wellington replies that he responded reasonably by "forward[ing Mr. Walker's] meal tray grievances to Aramark staff for a response and render[ing] a determination based on the investigation and returned and rejected any grievances that failed to comply with the grievance policy." [Filing No. 67 at 12.]

As the Court has decided for Grievance Specialist Crichfield, so too the Court decides for Grievance Manager Wellington. "[T]he alleged mishandling of [a plaintiff's] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim." *Owens*, 635 F.3d at 953. Accordingly, the Court **GRANTS** the Corrections Defendants' Motion for Summary Judgment as to Mr. Walker's Eighth Amendment claims against Grievance Manager Wellington.

40

c.    The Warden

As with prior Defendants, the Court analyzes if there is a material and genuine factual dispute over whether the Warden was personally responsible, whether he was deliberately indifferent, and whether he responded reasonably to the food issues in the prison.

### i.    Personal Responsibility

"A prisoner may not attribute any of his constitutional claims to higher officials by the doctrine of *respondeat superior*." *Antonelli*, 81 F.3d at 1428.  Therefore, a "supervising prison official" can be held liable under Section 1983 only if "that officer is shown to be personally responsible for a deprivation of a constitutional right." *Vance*, 97 F.3d at 992.  To be held personally responsible, "the official must actually have participated in the constitutional wrongdoing." *Antonelli*, 81 F.3d at 1428 (citation omitted).

This poses a significant hurdle to Mr. Walker's claim against the Warden.  Even if a warden "is the person ultimately in charge of, and responsible for, all day-to-day operations," "the general responsibility of a warden for supervising the operation of a prison is not sufficient to establish personal liability." *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998).  That is because "[i]t is doubtful that a prison warden would be directly involved in the day-to-day operation of the prison . . . such that he would have personally participated in, or have knowledge of, the kinds of decisions that led to" the constitutionally inadequate conditions. *Duncan v. Duckworth*, 644 F.2d 653, 656 (7th Cir. 1981) (affirming dismissal of claim against warden who was not involved in denying prisoner of medical care).  So "[e]ven if some of the written complaints that [the prisoner] allegedly filed were addressed directly to" him, he could not "realistically be expected to be personally involved in resolving a situation unless it were of the gravest nature." *Antonelli*, 81 F.3d at 1428-29.  Consequently, "an inference that a warden is directly involved in a prison's daily operations is not reasonable." *Steidl v. Gramley*, 151 F.3d 739, 742 (7th Cir. 1998).

But direct participation is not always the same as personal responsibility. Indeed, "a defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of section 1983 if [he] acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). "That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye . . . . In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery." *Vance*, 97 F.3d at 993 (internal quotation marks omitted). For example, a certain "policy" of the warden can rise "to the level of turn[ing] a blind eye." *Gentry*, 65 F.3d at 561 (citation omitted). Or in other circumstances, the warden "can be expected to know of or participate in creating systemic, as opposed to localized, situations." *Antonelli*, 81 F.3d at 1428-29. The key to the analysis is "sort[ing] the claims" into the categories of "clearly localized" or "potentially systemic." *Id.* As it pertains to the conduct of subordinates, "a warden is not liable for an isolated failure of his subordinates to carry out prison policies . . . unless the subordinates are acting (or failing to act) on the warden's instructions." *Steidl*, 151 F.3d at 741. Ultimately, "[i]ndividual defendants . . . who are responsible for setting prison policy[] can be held liable for a constitutional violation if they are aware of a systemic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy." *Sinn v. Lemmon*, 911 F.3d 412, 422 (7th Cir. 2018) (quoting *Steidl*, 151 F.3d at 741) (internal quotation marks omitted).

Beginning with direct participation, the Seventh Circuit has acknowledged the possibility that a "warden might have temporarily taken on direct management of some aspects of the prison." *Steidl*, 151 F.3d as 742. That is the case here. In the Warden's affidavit, he indicates that he was

personally evaluating prison complaints about food portions, stating that "[p]er [his] knowledge and experience as Warden, [he] found that most [restricted housing] inmates who launched these complaints were fabricating and/or falsely reporting issues with their food trays to try to obtain additional meal items and/or to express their displeasure with . . . commissary and/or property restrictions." [Filing No. 51-2 at 6.] He acknowledges specifically that this occurred "during the timeframe alleged," and that inmates would complain about food "approximately every other week" and that he investigated the truthfulness of those complaints, pursuant to which he "did not find evidence of a frequent or large-scale problem with inmates receiving insufficient food trays." [Filing No. 51-2 at 6-7.] The Warden also states that in response to isolated instances of food shortages in October 2022, he "personally" reached out to "Aramark to develop a quality control plan to investigate and prevent any food tray portioning issues." [Filing No. 51-2 at 8.] Having personally and directly involved himself in the issues regarding adequate food in the prison, and having intervened in a potentially systemic violation, there is some evidence that the Warden participated in a potential constitutional violation – and hence a genuine dispute of material fact exists as to his personal responsibility.

### ii.    Deliberate Indifference

The Warden argues that he "lacked knowledge of [Mr. Walker's] particular deprivations or of a systemic issue with inmate meal tray adequacy" and "the purported risk of harm [Mr. Walker] was subjected to due to these deficiencies, or of [the prison] staff's supposed ongoing failures to ensure that inmates received suitable meals during the timeframe alleged." [Filing No. 57 at 27.] He notes that "[n]one of [Mr. Walker's] food-related grievances were reviewed or processed by [the Warden]," nor did he "recall ever corresponding with [Mr. Walker] regarding his food service issues." [Filing No. 57 at 27-28.] He states that he determined that inmates' complaints reflected

primarily "isolated occurrences of inmates receiving underserved portions," with the remainder attributable to "false reports." [Filing No. 57 at 28.]

As with prior Defendants, Mr. Walker argues that the Warden "falsely and frivolously claim[s]" not having any "knowledge of the serious health risk" to him because the Warden permitted Mr. Walker to be "continuously serv[ed] inadequate food portions." [Filing No. 65 at 26.] He states that the Warden received the e-mail describing the "safety" in restricted housing caused by "serving incarcerated individuals insufficient trays." [Filing No. 65 at 26.] He notes, for example, the incident report e-mailed to the Warden describing a tray shortage as early as February 2022. [Filing No. 65 at 15.] He argues that the Warden "had knowledge of a risk of harm associated with compelling [Mr. Walker] to eat insufficient trays," and was therefore deliberately indifferent. [Filing No. 65 at 26.]

The Warden replies that he "did not have notice that [Mr. Walker's] tray irregularities jeopardized [Mr. Walker's] health or safety." [Filing No. 67 at 9.] He reiterates that from his experience with restricted housing complaints and investigating them, "did not have knowledge of a widespread lapse in inmates receiving adequate food trays." [Filing No. 67 at 11.] He argues that he was therefore not deliberately indifferent. [Filing No. 67 at 9-12.]

The Supreme Court has explained that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

"[I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of [harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in

the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant official had actual knowledge of the risk." *Farmer*, 511 U.S. at 842-43 (quotation marks omitted).  Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted).  Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . , and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 837.

Importantly, a prison official need not have "acted or failed to act believing that harm actually would befall" an inmate; it is enough to show that he "acted or failed to act despite his knowledge of a substantial risk." *Gray*, 826 F.3d at 1008.  This also means that a prison official need not have "intended the harm that ultimately transpired or believed the harm would occur." *Vance*, 97 F.3d at 992.  And "prison officials need not be specifically aware of the precise risk that unfolds." *Haley v. Gross*, 86 F.3d 630, 643 n.33 (7th Cir. 1996).  It is "irrelevant to liability that the officials could not guess beforehand precisely" how the inmate would be harmed. *Farmer*, 511 U.S. at 843-44.  That is, a prison official must know about the constitutionally unacceptable risk of harm posed by the prison condition, not the actual harm that ultimately befalls an inmate. *Id.* This means that, while the Court agrees with the Warden that Mr. Walker did not describe his direct

health issues to them, it ultimately does not change the analysis because the Warden only needed to appreciate the risk to his health posed by the condition, not his actual and current health status.

For Eighth Amendment food cases, the plaintiff must show a dispute over whether "the named defendants were aware that he was not receiving the amount of food or the types of food that [the] Master Menu[] prescribed." *Shah*, 927 F.3d at 481. This includes "evidence that [the defendant] knew that the [food] program was nutritionally deficient, or that inmates were being served nutritionally inadequate meals regardless of the requirements of the [food] program." *Id.* at 480.

At least one prison employee's statements indicate food discrepancies in the prison were systemically deficient. IDOC employee Mark D. Hunt emailed the Warden about the discrepancies in food, stating that the issue was "ongoing." [Filing No. 65 at 190.] He also indicated there were attempts to resolve the food issue which were unsuccessful, stating the problem "sometimes gets corrected for a week or so and then goes right back to the same thing again." [Filing No. 65 at 190.] And he indicated that the food issue was widely known in the prison among inmates and staff alike, stating that the food issue "has become a safety issue for the staff," presumably because of conflict between staff and inmates that was persistent. [Filing No. 65 at 190.] Additionally, Mr. Walker testified in his deposition that he had a few verbal conversations with the Warden about the issue. [Filing No. 51-1 at 73-74.] And Mr. Walker contemporaneously reported that Officer Simmerman e-mailed the Warden about his food issues. [Filing No. 65 at 108.] An official cannot evade the inference from obviousness where "he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist," "resist[ed] opportunities to obtain final confirmation," or "refuse[d] to listen to a subordinate who he strongly suspects will attempt to explain" the risk. *Farmer*, 511 U.S. at 837

n.8. Mr. Hunt's email indicates that simply personally examining food trays could have been a "final confirmation" to "verify underlying facts." *Id.* There is thus a dispute of fact over whether the food issues at the prison were systemic such that the Warden "can be expected to . . . participate in creating systemic, as opposed to localized, situations." *Antonelli*, 81 F.3d at 1428-29. And at minimum there is a question of fact whether "there is sufficient evidence to permit a jury to determine that the warden was sufficiently alerted of a lapse" in constitutional prison conditions "as to require [his] intervention or further investigation." *Vance*, 97 F.3d at 994.

Additionally, in this case, the risk of harm was obvious. It is common sense that continuously depriving someone of adequate nutrition can lead to unexpected weight loss, which could worsen any number of medical conditions, whether or not a person began with a healthy BMI and whether or not a prison official knew of those conditions at the time. This is what distinguishes a case about inadequate medical treatment from a case about other kinds of unconstitutional prison conditions. *See Gray*, 826 at 1006 (holding that "[e]xcessive cold, for example, can also amount to an Eighth Amendment violation, even if the prisoner has not yet come down with the flu"). On the other hand, "[t]hat a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so." *Farmer*, 511 U.S. at 844. This creates a genuine issue of material fact related to the Warden's culpable state of mind regarding risk to Mr. Walker or any other inmate who was allegedly deprived of adequate nutrition.

### iii.    Reasonable Response

The final question is whether the Warden responded reasonably to the risk posed by the alleged deprivation of food. The Warden argues that he "responded reasonably to RSH inmates' complaints of reoccurring, widespread issues with meal tray adequacy." [Filing No. 57 at 28.] He states that he "investigated the legitimacy of the issue by evaluating a wide range of factors" and

simply concluded there was no "recurrent staff neglect" and "no corrective action was necessary." [Filing No. 57 at 29.]

Mr. Walker responds that the Warden did not "respond reasonably to [his] complaints of diminished or omitted food items." [Filing No. 65 at 27.]  He states that "[t]he food deprivation issue was widespread and was a systematic health & safety issue for both inmates and staff as Defendants' emails have indicated." [Filing No. 65 at 27.]

The Warden replies that he responded reasonably because he "investigated . . . inmates' complaints regarding food service issues, made a determination regarding whether the problem was legitimate, and instituted a plan to remedy the isolated meal tray discrepancies that resulted from . . . staffing shortages." [Filing No. 67 at 12.]

The Supreme Court has explained that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.  Likewise, "officials do not act with 'deliberate indifference' if they are helpless to correct the protested conditions." *Dixon*, 114 F.3d at 645.  Further, "[e]ven if defendant knows that the prisoner is being subjected to a risk of harm, the defendant's refusal to act may be reasonable if the prisoner's own conduct is contributing to that risk or if there are competing security concerns." *Seventh Circuit Pattern Civil Jury Instructions* 175 cmt. h (7th Cir. 2017).  On the other hand, "[k]nowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference." *Gray*, 826 F.3d at 1009.

On this issue, too, there is a dispute of fact.  A reasonable jury could find either that the Warden personally intervened to address the food issue, but it could alternatively find that the Warden intervened eventually, but in the meantime, failed to interdict a substantial risk of harm

given there was a prison-employee report of food-portion shortages as early as February 2022. Further, an email from an IDOC employee asserted, "[t]his is an ongoing issue that sometimes gets corrected for a week or so and then goes right back to the same thing again." [Filing No. 65 at 190.] A jury could reasonably find that whatever investigative or policy measures the Warden took, he was "[k]nowingly persisting in an approach that d[id] not make a dent in the problem," amounting to "evidence from which a jury could infer deliberate indifference." *Gray*, 826 F.3d at 1009.

The Court **DENIES** the Motion for Summary Judgment as to Mr. Walker's Eighth Amendment claim against the Warden.

d.    Officer Defendants

As the Court has done for prior Defendants, for the remaining Defendants, the Court determines whether there is a genuine dispute of material fact over whether each Defendant was personally responsible, deliberately indifferent, and responded reasonably. The Court restates briefly the legal standards applying to each component: A defendant must be "personally responsible for the deprivation of a constitutional right," or else a plaintiff cannot "recover damages under § 1983." *Whitfield*, 76 F.4th at 706 (quoting *Gentry*, 65 F.3d at 561). To demonstrate "deliberate indifference," a prisoner must establish that a defendant had a culpable state of mind — that he was "subjectively aware of these conditions and refused to take steps to correct them." *Thomas*, 2 F.4th at 720. If a defendant "responded reasonably to the risk," he "may be found free from liability . . . even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844 (citation and quotation marks omitted). For this analysis, each Officer Defendant is considered individually.

i.    **Lieutenant Holcomb**

Lieutenant Holcomb argues that he "had no knowledge of a risk of harm associated with compelling [Mr. Walker] to eat the allegedly insufficient trays." [Filing No. 57 at 24.] He avers

49

that "[t]he only information [Mr. Walker] conveyed to [him] regarding his trays is that they were 'incorrect' or missing an item," not that "failing to remedy these deficiencies would jeopardize his physical health in any manner." [Filing No. 57 at 24.] He states further that "[t]here is no evidence that" he "failed to respond reasonably to [Mr.] Walker's complaints of diminished or omitted food items." [Filing No. 57 at 25.] Lieutenant Holcomb argues that he properly received complaints about food issues from officers under his supervision and "on numerous occasions . . . took the precise actions [Mr. Walker] sought to remedy his food denials by reporting the issues to Aramark and requesting delivery of replacement trays and/or additional food or beverage items to atone for the faulty trays." [Filing No. 57 at 26.] Lieutenant Holcomb states that Mr. Walker testified in his deposition that "at times, [he] received substitute trays and meal items as requested." [Filing No. 57 at 26-27.] Lieutenant Holcomb argues that he was thus not deliberately indifferent and instead responded reasonably to the food issue. [Filing No. 57 at 25-27.]

Mr. Walker responds generally that Lieutenant Holcomb, like all the Defendants, had "knowledge of the serious health risk to" him because of continuous shortages in food portions and that he failed to respond reasonably even though the problem was "a systemic health & safety issue[]" and even though he communicated his problems through grievances. [Filing No. 65 at 26-27.] Mr. Walker argues that Lieutenant Holcomb "repeatedly failed to reasonably respond by"

saying that he "couldn't do anything about [the] tray or failing to replace the insufficient tray and even falsely claiming that there were no issues with the trays at all." [Filing No. 65 at 28.]⁸

Lieutenant Holcomb replies that Mr. Walker at most told him that his meal trays were incorrect, not that "these deficiencies were preventing him from maintaining a healthy weight or causing any of the other mental or physical symptoms." [Filing No. 67 at 9.] Lieutenant Holcomb states that any grievances were not handled by him. [Filing No. 67 at 10-11.] He states also that the prison-employee e-mail regarding a "safety risk" did not refer to the food issue, but to "major issues between staff and offenders," "meaning that the inmates would become so outraged by the discrepancies that they would become hostile towards staff." [Filing No. 67 at 11.] He avers that "the email is silent regarding the effect the meal tray issues had on inmates' physical wellbeing and makes no suggestion" that he was "aware of any such impact." [Filing No. 67 at 11.] Lieutenant Holcomb argues that he responded reasonably by "when appropriate, call[ing] Aramark to report the errors and request tray replacements." [Filing No. 67 at 12.]

---

⁸ Mr. Walker further argued that he and other inmates told Lieutenant Holcomb and all of the other Defendants "that the food deprivation caused him and other[s] serious health risk[s]." [Filing No. 65 at 26.] Lieutenant Holcomb has challenged Mr. Walker's assertion in his affidavit that Mr. Walker contradicts his deposition testimony. As to his conversations with Officer Defendants, Mr. Walker stated in his deposition that "the gist of our conversation would have just been the gist of it with all of them," about whether "anything [was] wrong with a tray." [Filing No. 51-1 at 47.] For the remainder of the analysis, the Court disregards Mr. Walker's allegation that he told any Officer Defendant about his specific health problems. *See James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (permitting a district court to "disregard . . . an affidavit that contradicts prior deposition testimony").

1.  Personal Responsibility

The Court evaluates whether Lieutenant Holcomb was personally responsible.  Mr. Walker states that although Lieutenant Holcomb "was trying to fix" the problem, [Filing No. 51-1 at 75-76], Mr. Walker also stated that Lieutenant Holcomb "did everything *besides order the new trays and send them*." [Filing No. 51-1 at 70] [emphasis added].  This testimony demonstrates that Lieutenant Holcomb's description of Mr. Walker's experience is literally true but practically misleading.  They state that Mr. Walker "at times . . . received substitute trays and meal items as requested." [Filing No. 57 at 26-27.]  But Mr. Walker actually testified that although he received trays on some occasions, importantly, he did "[n]ot from any of the defendants," including Lieutenant Holcomb.  [Filing No. 51-1 at 67.]

The question, then, is whether Lieutenant Holcomb had the ability to replace inadequate food trays but did not do so, causing Mr. Walker and other inmates to receive insufficient food.  But the parties do not agree on whose role it was to replace trays.  In their reply, the Aramark Defendants do not clarify exactly who had the authority to request replacement trays.  They state that "if a restricted housing unit did not have enough replacement trays, they could call the kitchen and request as many as they needed." [Filing No. 69 at 6.]  It is unclear who "they" refers to specifically and whether "they" includes Lieutenant Holcomb.  Who has the authority to replace trays is a central issue, and yet the Tray Replacement Policy's text is not in the record.  Food Service Manager Butler's affidavit is no more specific.  He states that "[t]he Tray Replacement Policy allows an inmate to report any issues with their tray to the correctional officer. . . .  If the correctional officer agrees the inmate's complaint is valid, the correctional officer then issues a new tray to the inmate." [Filing No. 48-1 at 3.]  Here, too, "correctional officer" is undefined and does not state which correctional officer at what rank.  The affidavit also states that an inmate can

simply approach a correctional officer, who then apparently directly "issues a new tray to the inmate." [Filing No. 48-1 at 3.] The Warden describes the replacement method differently. He states that "[i]n [restricted housing] units, the unit supervisor and pod officer were the only on-site personnel who had the authority to contact Aramark regarding meal service issues and/or request replacement trays or food." [Filing No. 51-2 at 5.] He states that "[i]f the unit supervisor or pod officer determined that the meal tray was seriously deficient in some way . . . they were required to report the issue to Aramark and request replacement trays or supplementary meal items to give to the inmate." [Filing No. 51-2 at 6.] "Unit supervisors" appears to include Lieutenant Holcomb. [*See* Filing No. 57 at 27 (Lieutenant Holcomb comparing himself to hypothetical "other unit supervisors or pod officers").] Food Service Manager Butler states that he sent "extra trays to the restricted housing units for each meal served . . . to address any complaints or concerns regarding trays that may have small portions." [Filing No. 69-1 at 1.] In the briefing, Food Service Manager Butler states that he did so "always." [Filing No. 69 at 6.] If replacement trays were always already on-site, there would be no need for Lieutenant Holcomb to call Aramark, which Food Service Manager Butler implicitly confirms by saying "[i]f a restricted housing unit did not have enough replacement trays, they could call the kitchen and request as many as needed." [Filing No. 69-1 at 1-2.] Finally, Mr. Walker clearly believes that Lieutenant Holcomb had the ability to issue replacement trays.

The parties' descriptions are not in agreement. There is a dispute over both who was authorized and able to replace deficient meal trays, a fundamental fact that is necessary in order to determine whether Lieutenant Holcomb was personally responsible for the alleged Eighth Amendment violation. A reasonable jury could find that utilization of the tray replacement option

could have avoided Mr. Walker's alleged injury, by ensuring adequate nutrition, so Lieutenant Holcomb's refusal to utilize it could support a claim of personal responsibility.

2. Deliberate Indifference

Next, the Court evaluates deliberate indifference as to Lieutenant Holcomb. As the Court has explained, "prison officials need not be specifically aware of the precise risk that unfolds." *Haley*, 86 F.3d at 643. So for purposes of determining deliberate indifference, it is "irrelevant to liability that the officials could not guess beforehand precisely" how the inmate would be harmed. *Farmer*, 511 U.S. at 843-44. So it is not necessary that Lieutenant Holcomb, or any Defendant, knew of Mr. Walker's exact injury, such as his weight loss and mental health problems. Rather, a Defendant only needs to have known about the risk of harm. No party disputes that Lieutenant Holcomb was aware of tray shortages. Mr. Walker stated in his deposition that "out of most of the [D]efendants, . . . he was one of the main ones that used to admit that he knew the trays were inadequate" [Filing No. 51-1 at 76.] And Mr. Walker states that Lieutenant Holcomb knew they were inadequate on not only one occasion; rather, Lieutenant Holcomb "told Aramark a thousand times to send the new trays over here." [Filing No. 51-1 at 70.] There is a dispute over whether Lieutenant Holcomb was deliberately indifferent or utilized the Tray Replacement Policy to cure the problem.

3. Reasonable Response

As for whether Lieutenant Holcomb responded reasonably, the Seventh Circuit has explained that public officials acting responsibly within their job description cannot be held liable:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done,

more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). But without clarity on Lieutenant Holcomb's power and responsibility to replace trays under the Tray Replacement Policy, there is an issue of fact regarding whether he "stay[ed] within his role" or responded unreasonably. *Id.* The Court observes that the Tray Replacement Policy is central to disputes over Lieutenant Holcomb's personal responsibility, deliberate indifference, and reasonable response.

The Court **DENIES** the Motion for Summary Judgment on Mr. Walker's Eighth Amendment claim against Lieutenant Holcomb.

### ii.    Sergeant Simmerman

Sergeant Simmerman argues that he "had no knowledge of the risk of harm associated with compelling [Mr. Walker] to eat the allegedly insufficient trays." [Filing No. 57 at 24.] He states that he "consistently responded appropriately to [Mr. Walker's] complaints of inadequate food trays by taking the only remedial measures available to" him as an officer, "photographing [Mr. Walker's] tray and notifying [Lieutenant] Holcomb of the reports." [Filing No. 57 at 25.] Sergeant Simmerman argues that he was not "at liberty to provide [Mr. Walker] with new trays or additional food or beverage items." [Filing No. 57 at 26.]

Mr. Walker responds that Sergeant Simmerman was "aware of [Mr. Walker's] particular deprivations and of the systematic issues with the meal tray adequacy." [Filing No. 65 at 29.] He argues that despite the Tray Replacement Policy, Sergeant Simmerman "repeatedly failed to reasonably respond by telling [Mr. Walker] [he] couldn't do anything about [the] tray or failing to replace the insufficient tray and even falsely claiming that there were no issues with the trays at all." [Filing No. 65 at 28.]

Sergeant Simmerman replies that he did not know about the risk of harm facing Mr. Walker and that he responded reasonably by "photograph[ing] any reported deficiency and notif[ying] the unit supervisor or pod officer of any known tray deficiencies." [Filing No. 67 at 9-12.]

1. Personal Responsibility

Just as with Lieutenant Holcomb, key to the causal connection between Sergeant Simmerman and a failure to replace meal trays is the dispute over his ability and responsibility to do so. Without clarity on the Tray Replacement Policy's contours, there is a dispute of fact over whether Sergeant Simmerman was personally responsible for providing insufficient food trays despite having the power and responsibility to replace them.

2. Deliberate Indifference

In a grievance, Mr. Walker stated that when he received inadequate trays, he reported "to Sgt. Chris Simmerman that [the] tray was incorrect[.] [H]e told me he will not replace [the] tray but he would report that [the] tray was incorrect." [Filing No. 51-6 at 27.] And he testified in his deposition that Sergeant Simmerman "on multiple occasions . . . had refused to replace [his] trays out of retaliation for" filing grievances against Officer Jobe and another officer. [Filing No. 51-1 at 80-81.] This is enough to raise an issue of fact on his deliberate indifference in that not only did Sergeant Simmerman know about multiple instances of insufficient trays but may well have intentionally not replaced trays out of retaliation.

3. Reasonable Response

As to reasonable response, intentionally declining to replace trays is, of course, unreasonable. And there remains a dispute of fact over whether the Tray Replacement Policy gave Sergeant Simmerman the ability and responsibility to replace insufficient food trays.

The Court **DENIES** the Motion for Summary Judgment on Mr. Walker's Eighth Amendment claim against Sergeant Simmerman.

### iii.    Officer Neff

Like Sergeant Simmerman, Officer Neff argues that he had no knowledge of the risk of harm to Mr. Walker and that he responded reasonably by photographing insufficient trays and raising the issue with Aramark.  [Filing No. 57 at 24-26.]

Mr. Walker replies that Officer Neff, like all the Defendants, knew about the food issue and simply declined to replace trays even though he could have.  [Filing No. 65 at 28-29.]

Officer Neff replies that he had no knowledge of Mr. Walker's health issues and reiterates that he responded reasonably by documenting insufficient trays and notifying a superior of "any known tray deficiencies."  [Filing No. 67 at 9-12.]

1.    Personal Responsibility

And for personal responsibility, just as with Lieutenant Holcomb, there is a question of fact whether there is a causal link between Officer Neff's inaction and Mr. Walker's lack of food, primarily dependent on whether Officer Neff could have and should have replaced Mr. Walker's food trays.

2.    Deliberate Indifference

Mr. Walker testified that once there was "something missing on [his] breakfast tray and [Officer Neff] refused to replace the tray.  [Officer Neff] also refused to give [Mr. Walker] apple juice and coffee . . . .  Then he told [Mr. Walker] to just take the tray.  Then once [Mr. Walker] took the tray, [Officer Neff] . . . refused to let [Mr. Walker] speak with Lieutenant Holcomb."  [Filing No. 51-1 at 48.]  This does not necessarily represent isolated bad batches of food, but rather whether these are but some examples of Officer Neff declining to replace trays that were missing

food.  This raises a factual dispute over whether Officer Neff was deliberately indifferent to the risk of consistently not providing sufficient trays for Mr. Walker and other inmates.

3.  <u>Reasonable Response</u>

As for reasonable response, again, the breadth of the Tray Replacement Policy poses a question of fact over whether Officer Neff had the power and responsibility to replace Mr. Walker's and other inmates' food trays.

The Court **DENIES** the Motion for Summary Judgment on Mr. Walker's Eighth Amendment claim against Officer Neff.

### iv.    Sergeant Smith

Officer Smith argues that he had no knowledge of Mr. Walker's health issues; he states that Mr. Walker "could not recall any particularized information regarding . . . [Sergeant] Smith's responses to his meal tray issues and essentially only assumes" that Sergeant Smith refused to replace his tray. [Filing No. 57 at 26.] Sergeant Smith argues that he was not "at liberty to provide [Mr. Walker] with new trays or additional food or beverage items upon [his] own volition, and there is no evidence or suggestion that [he] had the capacity and failed to take any other particular actions to rectify [Mr. Walker's] concerns." [Filing No. 57 at 26.] Sergeant Smith avers that he did what he was supposed to do, photograph nonconforming trays and notify Lieutenant Holcomb. [Filing No. 57 at 25.]

Mr. Walker responds that Officer Smith knew about the food shortage on trays and that he failed to reasonably respond by replacing insufficient trays and by pretending there was no food issue at all. [Filing No. 65 at 28.]

Sergeant Smith replies that, just like the other Officers, he did not "have notice that [Mr. Walker's] tray irregularities jeopardized" his health and safety. [Filing No. 67 at 9.] Sergeant

Smith notes that Mr. Walker "explicitly testified that he had no recollection of having such discussions with" Sergeant Smith.  [Filing No. 67 at 9.]  And Sergeant Smith reiterates that he "photographed any reported deficient tray and notified the unit supervisor or pod officer of any known tray deficiencies."  [Filing No. 67 at 12.]

    1.  Personal Responsibility

Just as with Lieutenant Holcomb, the Tray Replacement Policy is at the center of the material facts regarding Sergeant Smith's personal responsibility.  The question is whether he had the power and authority to replace trays but did not do so.

    2.  Deliberate Indifference

Mr. Walker testified that Sergeant Smith had "refus[ed] to replace [his] tray and just [told] [Mr. Walker] that he wasn't going to do it."  [Filing No. 51-1 at 82.]  Although Sergeant Smith argues that Mr. Walker did not provide more-specific testimony, many such interactions are likely not complicated or lengthy – Mr. Walker requested a new tray, and Sergeant Smith or some other Officer denied it.  Given the allegedly ongoing issue with trays and persistent disputes between prison staff and inmates in the restricted housing unit, this is enough to create a dispute of fact over whether Sergeant Smith was deliberately indifferent.

    3.  Reasonable Response

Just as over the question of personal responsibility, the dispute of fact over reasonable response is whether Sergeant Smith had the power and responsibility to replace insufficient food trays.

The Court **DENIES** the Motion for Summary Judgment on Mr. Walker's Eighth Amendment claim against Sergeant Smith.

### v.        Officer Arnold

Officer Arnold argues that he had no knowledge of Mr. Walker's health problems associated with the alleged lack of food, and that he only learned from Mr. Walker that trays were merely incorrect.  [Filing No. 57 at 24.]  Officer Arnold further argues that he responded reasonably "by taking the only remedial measures available to" him as an officer, "photographing [Mr. Walker's] tray and notifying" Lieutenant Holcomb.  [Filing No. 57 at 25.]

Mr. Walker responds the same as before, that Officer Arnold knew of a food-portion issue and refused to replaced trays even though it was within his power to do so.  [Filing No. 65 at 28.]

Officer Arnold reiterates that he "did not have notice that [Mr. Walker's] tray irregularities jeopardized [Mr. Walker's] health or safety."  [Filing No. 67 at 9.]  He specifically notes that Mr. Walker "explicitly testified that he had no recollection of having such discussions with" Officer Arnold.  [Filing No. 67 at 9.]

#### 1.  Personal Responsibility

The Tray Replacement Policy is again at the center of the material factual disputes over personal responsibility, this time regarding Officer Arnold.  The question is whether he had the power and authority to replace trays but did not do so.

#### 2.  Deliberate Indifference

In Mr. Walker's deposition, he testified that he "remember[s] [Officer] Arnold refusing to swap [his] tray out."  [Filing No. 51-1 at 83.]  Given the supposedly ongoing issues with food trays and the allegedly well-known food portion issue among inmates and staff alike, this is enough to raise a factual dispute over whether Officer Arnold was deliberately indifferent to Mr. Walker's lack of food.

3.  Reasonable Response

Just as with personal responsibility, the material factual dispute is whether Officer Arnold had the power and responsibility to replace insufficient food trays.

The Court **DENIES** the Motion for Summary Judgment on Mr. Walker's Eighth Amendment claim against Officer Arnold.

### vi.    Officer Jobe

As with the prior Officers, Officer Jobe argues that he had no knowledge of Mr. Walker's health problems connected to a lack of food on his tray and Officer Jobe's knowledge extended only to the fact that sometimes trays were deficient.  [Filing No. 57 at 24.]  Officer Jobe adds that he responded reasonably by documenting and reporting insufficient trays because he did not have the authority to replace them.  [Filing No. 57 at 25.]

Mr. Walker reiterates his prior arguments that Officer Jobe knew of a systemic food-portion shortage and did nothing to replace trays when he had the power and responsibility to do so.  [Filing No. 65 at 27-29.]

Officer Jobe replies that he did not know about Mr. Walker's health problems and responded reasonably by "photograph[ing] any reported deficient tray and notif[ying] the unit supervisor or pod officer of any known tray deficiencies."  [Filing No. 67 at 12.]

1.  Personal Responsibility

As to personal responsibility, the Tray Replacement Policy is again in dispute regarding whether Officer Jobe had the power and responsibility to replace trays.  Additionally, if true, putting spit in Mr. Walker's food would doubtlessly demonstrate personal responsibility for discouraging Mr. Walker from eating his food.

2. Deliberate Indifference

Mr. Walker testified that not only did Officer Jobe refuse to replace his deficient food trays, Officer Jobe also may have deliberately put hair or spit in Mr. Walker's food. This is enough to raise a material factual dispute over whether Officer Jobe was deliberately indifferent to Mr. Walker's lack of food on his trays.

3. Reasonable Response

Just as with personal responsibility and with all prior Officer Defendants, the material factual dispute is whether Officer Jobe had the ability and responsibility to replace insufficient food trays. Beyond the allegations against prior Officer Defendants, there is also a dispute over whether Officer Jobe spit in Mr. Walker's food, undoubtedly an unreasonable response.

The Court **DENIES** the Motion for Summary Judgment on Mr. Walker's Eighth Amendment claim against Officer Jobe.

e. Aramark Food Service Manager Butler

Food Service Manager Butler argues that Mr. Walker "has not provided any evidence that [he] acted with deliberate indifference by simply providing the diet to [Mr. Walker] as specified in Aramark's contract," and that because of the contract's stipulation to a certain kind of diet, he was legally unable to be deliberately indifferent because "Aramark had no authority under its contract with the prison to make [Mr.] Walker's requested dietary changes." [Filing No. 47 at 17-18.] Food Service Manager Butler states that the "Master Menu [is] served to inmates on a daily basis [and] is approved by the IDOC," as well as Aramark's "registered dietician." [Filing No. 47 at 19.] He states that to the best of Food Service Manager Butler's knowledge, Mr. Walker was "receiving a nutritiously adequate diet" and that he was not aware of "meals being served . . . with portion sizes that did not comply with the Master Menu" since the serving utensils are standardized to prepare

meals in compliance with the Master Menu.  [Filing No. 47 at 19.]  Food Service Manager Butler avers that he simply "oversees the preparation of trays," and it is IDOC officers who pass those trays out to prisoners.  [Filing No. 47 at 19.]  Food Service Manager Butler states that he was "aware of intermittent complaints about various food items, but [had] no knowledge of a widespread issue regarding inadequate food portions or spoiled items to inmates."  [Filing No. 48-1 at 4.]

Mr. Walker's response asserts largely the same arguments as against the Corrections Defendants, that Food Service Manager Butler knew about a food-shortage problem and failed to fix it.  [E.g., Filing No. 65 at 26-29.]

Food Service Manager Butler replies that as it pertains to the photos of the food and the email he received, "with the exception of one food item, the trays appear to be consistent with the sample trays," and that he knew only about food issues that were "intermittent," not "widespread." [Filing No. 69 at 5.]  Food Service Manager Butler asserts that he "sent sample trays with each meal to the restricted housing units . . . to allow the officers delivering food to inmates to confirm the trays they were serving were compliant with the Master Menu."  [Filing No. 69 at 6.]  He states that he "always prepared extra trays to be delivered to the restricted housing units, just in case they needed replacement trays. . . . [I]f a restricted housing unit did not have enough replacement trays, they could call the kitchen and request as many as they needed."  [Filing No. 69 at 6.]  Food Service Manager Butler States that "[t]o the best of [his] knowledge, the inmates, including [Mr. Walker], received a nutritional diet."  [Filing No. 69 at 6.]

1. Personal Responsibility

Key to the dispute over Food Service Manager Butler's personal responsibility is yet again the Tray Replacement Policy, as well as his role in food preparation.  Mr. Walker stated that many

officers – not just inmates – complained to Aramark, but despite those complaints, there is evidence in the record that trays were not replaced when they should have been.  A reasonable jury could find that Food Service Manager Butler did not honor the Tray Replacement Policy when invoked by inmates and staff.  Additionally, as the manager of food preparation for the restricted housing units, Food Service Manager Butler had the ability and responsibility to make corrections to food shortages.  In this vein, a reasonable jury could find that Food Service Manager Butler did not fulfill that responsibility.

2.  Deliberate Indifference

The Seventh Circuit has held that regarding deliberate indifference "what matters is the relevant defendant's subjective awareness" "along with any other information that defendant" has, "includ[ing] the inmate's complaints."  *Sinn*, 911 F.3d at 521.  Prisoner requests for relief that fall on "deaf ears" may show deliberate indifference.  *Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015).  It is relevant that there were "previous request[s]" to remedy the condition but those requests "had fallen on deaf ears."  *Jones v. Morris*, 777 F.2d 1277, 1280 n.5 (7th Cir. 1985).  And it is also relevant that the allegedly unconstitutional violation represented a "history" or "pattern."  *Sinn*, 911 F.3d at 423.  In this case, Mr. Walker has demonstrated multiple requests for relief in the form of grievances that Food Service Manager Butler responded to, and indeed was obligated to rectify in his role as Manager.  There were inklings of potential issues as early as February 2022, grievances in the months preceding October 2022 when the Warden intervened, and apparently widespread discontent even among officers who contacted Aramark.  As overseer of the food preparation process, he was in a unique position to observe persistent food shortages even before the Warden intervened.  A reasonable jury may well find that Food Service Manager Butler knew

all along about the persistent food shortage but declined to rectify the problem.  There is a dispute of material fact over whether Food Service Manager Butler was deliberately indifferent.

3.  <u>Reasonable Response</u>

Just as with the Officer Defendants, the Tray Replacement Policy plays a role in determining whether Food Service Manager Butler responded reasonably, whether that entailed properly honoring the Tray Replacement Policy or properly responding to food shortage issues on his watch as Food Service Manager.

Mr. Walker has raised a genuine issue of material fact over whether Food Service Manager Butler was deliberately indifferent, did not respond reasonably, and was personally responsible. The Court **DENIES** the Aramark Defendants' Motion for Summary Judgment as to Mr. Walker's Eighth Amendment claim against Food Service Manager Butler.

4.  *Qualified Immunity*

The Corrections Defendants argue that they are "entitled to qualified immunity on [Mr.] Walker's Eighth Amendment claims." [Filing No. 57 at 32.]  They state that "[t]here is no clearly established right for inmates to receive the exact meals enumerated by their prison meal plan." [Filing No. 57 at 33.]

Mr. Walker argues that the Corrections Defendants "are not entitled to qualified immunity due to the fact that the deprivation of adequate food and retaliation were both clearly establish[ed] constitutional rights at the time of the violation." [Filing No. 65 at 18.]  He avers that "[t]he Constitution requires that inmates receive well-balance meals, containing sufficient nutritional value to preserve their health." [Filing No. 65 at 18-19.]

The Corrections Defendants reply that "the undisputed evidence in this case shows that [Mr.] Walker was, on occasion, deprived only of the precise meals enumerated under the Aramark meal plan, which is not a clearly established constitutional right." [Filing No. 67 at 13.]

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To overcome the defendant's invocation of qualified immunity, [a plaintiff] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton,* 483 U.S. 635, 646 (1987)). To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 583 U.S. at 64 (quoting *Anderson*, 483 U.S. at 641). While "a case directly on point" is not required, "precedent must have placed the . . . constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). Put slightly differently, a right is clearly established only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough

to provide fair notice because qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quotation marks omitted)).  Qualified immunity thus "balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231.

The Corrections Defendants misstate Mr. Walker's argument.  Mr. Walker is not arguing that not complying with the Aramark meal plan is a constitutional violation; he is arguing that systemically inadequate food is itself a constitutional violation.  In that vein, *Farmer* – the very Supreme Court case that defined the phrase "deliberate indifference" – clearly established that "prison officials must ensure that inmates receive adequate food." *Farmer*, 511 U.S. at 832.  The Court holds that the Corrections Defendants are not entitled to qualified immunity because there is a genuine issue of material fact regarding whether the Officer Defendants violated Mr. Walker's Eighth Amendment right to adequate food and because such a right is clearly established.

To summarize the Eighth Amendment rulings, the Court **GRANTS** summary judgment to all Defendants as to the various instances where Mr. Walker received bad batches of food.  The Court **GRANTS** the Corrections Defendants' Motion for Summary Judgment as to Mr. Walker's Eighth Amendment claims against Grievance Manager Thomas Wellington and Grievance Specialist Shelby Crichfield.  The Court **DENIES** the Corrections Defendants' Motion for Summary Judgment as to Mr. Walker's Eighth Amendment claim against the Warden.  The Court **DENIES** the Corrections Defendants' Motion for Summary Judgment on Mr. Walker's Eighth Amendment claim against the Officer Defendants.  The Court **GRANTS** the Aramark Defendants' Motion for Summary Judgment as to Mr. Walker's Eighth Amendment claim against Aramark Food

Services as Mr. Walker withdrew the claim.  And the Court **DENIES** the Aramark Defendants' Motion for Summary Judgment as to Mr. Walker's Eighth Amendment claim against Food Service Manager Butler.

### B.    First Amendment Retaliation Claim against Officer Jobe

Officer Jobe argues that "[t]here is no evidence that [he] spit in [Mr. Walker's] food." [Filing No. 57 at 33.]  Officer Jobe argues that Mr. Walker's "allegations that [he] 'probably' spit into [Mr. Walker's] meals with saliva is impermissibly speculative." [Filing No. 57 at 34.]  Officer Jobe points out that Mr. Walker "never observed [him] spit into" the food and "couldn't tell" whether the liquid substance Mr. Walker did see was "'actually spit' rather than food seepage or any other benign substance." [Filing No. 57 at 34.]  Officer Jobe also argues that "[t]he presence of hairs in an inmate's food is not sufficient to deter First Amendment activity." [Filing No. 57 at 34.]  He states that there is no dispute that "the intermittent addition of a few stray hairs rendered [Mr. Walker's] food unsanitary or unsafe to consume or that ill-effects of the hairs could not easily be resolved by [Mr. Walker] simply by removing the hair or refraining from eating the food in direct contact with the hairs." [Filing No. 57 at 34.]  Officer Jobe asserts that inmates are entitled only to "adequate food," not "appetizing" food, "therefore, the mere non-palatability of food containing a few hairs is insufficient to chill protected speech in the context of the harsh realities of prison." [Filing No. 54 at 35.]  He avers further that if the hairs on the food were considered a "dignitary harm," such harms are "generally not cognizable for the purpose of establishing a sufficient deterrent." [Filing No. 57 at 35.]

Mr. Walker responds that Officer Jobe retaliated against him for exercising his First Amendment rights. [Filing No. 65 at 32.]  Mr. Walker states that he was assaulted on January 6, 2022, by Officer Jobe and another officer not a party to this case. [Filing No. 65 at 32.]  He filed a grievance against Officer Jobe "for his part in the assault." [Filing No. 65 at 32.]  After filing a

grievance, Mr. Walker states that Officer Jobe "began to harass and retaliate against [him] by placing . . . hair in [his] food every time [Officer Jobe] worked on his unit." [Filing No. 65 at 32.] Mr. Walker states that Officer Jobe even admitted to others that Officer Jobe was putting hair in Mr. Walker's food for "snitching" and "to keep him from snitching again." [Filing No. 65 at 32-33.] He states that Officer Jobe "has paid individuals to throw bodily fluids on [him] and has even placed a cash bounty on" him. [Filing No. 65 at 33.] He provides numerous affidavits from other inmates attesting to witnessing retaliation, for example stating that Officer Jobe said "that he was putting hair in Mr. Walker's food for telling on him." [*E.g.*, Filing No. 65 at 245 (affidavit of inmate Rashaad Hogan); *see also* Filing No. 65 at 249 (affidavit of inmate Darius Printup); Filing No. 65 at 250 (affidavit of inmate Chris Gregory); Filing No. 65 at 247-48 (affidavit of inmate Xane Hively stating Officer Jobe said it was "pubic hair").] Mr. Walker states that all of this alleged retaliation kept him "from eating for weeks and also caused [him] to suffer insomnia and weight loss," leading to him filing a request to be seen for mental health issues. [Filing No. 65 at 32.] He believes that the retaliation is "also one of the reasons [he] suffered a mental health crisis and attempted suicide." [Filing No. 65 at 33.] He argues that the "First Amendment prohibits jail and prison officials from retaliating against inmates who report complaints, file grievances, or file lawsuits." [Filing No. 65 at 33-34.] He argues that "tampering with [his] food served no penological interest and wouldn't have happen[ed] for any other reason [besides] to harass and deter [him] from exercising his First Amendment [rights]." [Filing No. 65 at 34.] He argues that,

therefore, "[Officer] Jobe is not entitled to summary judgment on [his] First Amendment claims." [Filing No. 65 at 34.]⁹

In reply, Officer Jobe reiterates his position and states that Mr. Walker "has not designated any evidence to show that [Mr. Walker] received anything more than the occasional placement of hairs in [Mr. Walker's] food." [Filing No. 67 at 15.] Officer Jobe avers that none of his alleged actions had "any chilling effect on [Mr. Walker's] ability to exercise his free speech as he continued to frequently file grievances and complaints," including against Officer Jobe. [Filing No. 67 at 15.]

To succeed on a First Amendment retaliation claim, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action. *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 668, 680 (7th Cir. 2020). If they can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.* Whether allegedly retaliatory

---

⁹ Mr. Walker also argued that Officer Jobe convinced other inmates to harm him and labeled him a snitch, facts which Officer Jobe challenges as "irrelevant and inadmissible as they have not been raised until [Mr. Walker] filed his response." [Filing No. 67 at 15.] The Court agrees. These are new factual allegations, and "district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend." *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023). As the Seventh Circuit has explained, "[i]t [is] rarely appropriate to do so." *Id.* at 490. Accordingly, the Court declines to consider allegations that Officer Jobe encouraged other inmates to harm him, throw bodily waste at him, and treat him as a "snitch."

conduct would "deter a person of ordinary firmness" from exercising his First Amendment rights is an objective test, *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020), and the standard "does not hinge on the personal experience of the plaintiff," *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020).

At summary judgment, the burden of proof on whether the protected activity was a motivating factor for the alleged retaliation "is split between the parties." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). Initially, a plaintiff "must produce evidence that his speech was at least a motivating factor . . . of the [] decision to take retaliatory action against him." *Id.* The burden then shifts to the defendant "to rebut the causal inference raised by the plaintiff's evidence." *Id.* If the defendant rebuts the causal inference by demonstrating a legitimate reason for the alleged retaliatory action, "the plaintiff must present evidence that the defendant's proffered explanation is pretextual." *Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001).

### 1. Protected Activity

"'A prisoner has a First Amendment right to make grievances about conditions of confinement.'" *Douglas*, 954 F.3d at 646 (quoting *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010)). Therefore, the First Amendment prohibits correctional staff from "retaliat[ing] against an inmate because he filed grievances." *Manuel*, 966 F.3d at 680 (citing *Antoine v. Ramos*, 497 F. App'x 631, 634 (7th Cir. 2021)). There is no dispute that Mr. Walker's use of the grievance process is an activity protected by the First Amendment, so the Court advances to analyzing whether Officer Jobe's alleged actions were adverse.

### 2. Adverse Action

An adverse action for First Amendment retaliation must objectively "be sufficiently clear and emphatic to deter a person of 'ordinary firmness' from submitting such petitions in the future." *Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016). Although "[t]he standard focuses on an average

person in the plaintiff's circumstances," the standard is "often referred to as 'a prisoner of ordinary firmness,'" such that the adverse action would "reasonably be expected to deter an inmate from [engaging in protected activity] in the future." *Seventh Circuit Pattern Civil Jury Instructions* 142, 6.03 cmt. c. (7th Cir. 2017) (quoting *May v. Trancoso*, 412 F. App'x 899, 904 (7th Cir. 2011)). "[T]he harsh realities of a prison environment affect . . . consideration of what actions are sufficiently adverse." *Holleman*, 951 F.3d at 880–81. "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." *Id.* at 880. In the prison setting, adverse actions include sufficiently serious "harassment." *Bridges v. Gilbert*, 557 F.3d 541, 552-53 (7th Cir. 2009). "Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact." *Douglas*, 964 F.3d at 647.

Mr. Walker states that after he filed grievances, Officer Jobe deliberately placed his hair in Mr. Walker's food, that Officer Jobe told Mr. Walker this, and that other inmates attested to this occurring – and potentially that it was Officer Jobe's pubic hair. Even if the allegation of spit in Mr. Walker's food was speculative, there is sufficient evidence to create a genuine dispute of material fact over whether Officer Jobe tampered with Mr. Walker's food. It follows that a reasonable juror could find that it was an adverse action for Officer Jobe to place his hair in Mr. Walker's food.

Officer Jobe argues that because Mr. Walker was entitled to only "adequate" food, and not "appetizing" food, hairs in his food do not amount to an adverse action. [Filing No. 57 at 35.] But that is the standard for the Eighth Amendment. *Williams*, 102 F. App'x at 507 (holding that food that is merely unappetizing is not an Eighth Amendment violation). For the purposes of a First Amendment violation, the adverse actions "need not be extreme," *Massey v. Johnson*, 457 F.3d

711, 720 (7th Cir. 2006), "nor need they independently violate the constitution," *Streckenbach v. Meisner*, 768 F. App'x 565, 569 (7th Cir. 2019).  "Conduct that does not independently violate the Constitution can form the basis for a retaliation claim, if that conduct is done with an improper, retaliatory motive." *Holleman*, 951 F.3d at 878.  So even if hairs in Mr. Walker's food were not an Eighth Amendment violation, a reasonable jury could find that being fed food topped with Officer Jobe's hair – and potentially his pubic hair – in retaliation for grievances could still deter or punish a prisoner of ordinary firmness from engaging in protected First Amendment Activity.

In arguing that Mr. Walker's speech was not chilled, Officer Jobe incorrectly merges multiple legal concepts together.  Officer Jobe argues that the fact that Mr. Walker continued filing grievances indicates his speech was not chilled.  [Filing No. 67 at 15.]  This fact might suffice if Mr. Walker was claiming that he was denied access to "petition the government for redress of grievances," but such a claim "does not arise under a retaliation theory." *Bridges*, 557 F.3d at 555.  Mr. Walker's claim is that he was retaliated against for complaining, not that he was prevented from complaining.  A purpose of prohibiting retaliation is to ensure that prisoners can exercise their constitutional rights without fear of retribution from prison officials; so although Mr. Walker continued to file grievances, it would still be unlawful to improperly punish him for his previous complaints for an alleged assault because "penalties for past speech are forbidden." *Beatty v. Henshaw*, 826 F. App'x 561, 563 (7th Cir. 2020).

### 3. *Causal Connection*

Finally, the Court evaluates whether there is a genuine dispute over causation, which means "the speech or activity was at least a motivating factor in the decision to take retaliatory action." *Manuel*, 966 F.3d at 680.  "The 'motivating factor' amounts to a causal link between the activity and the unlawful retaliation." *Id.*  A plaintiff may meet his burden on the issue by offering "[c]ircumstantial evidence [including] suspicious timing, ambiguous statements, behavior, or

comments directed at other[s] . . . in the protected group." *Id.* But "inferences supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007); *Stagman v. Ryan*, 176 F.3d 986, 999-1000 (7th Cir. 1999) ("Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that defendants knew of the protected speech.").

Mr. Walker has stated that before he filed grievances for Officer Jobe's alleged assault, he did not find hair in his food and that after he filed grievances, he did find hair in his food. That is suspicious timing. Mr. Walker and his affiants also stated that Officer Jobe specifically told Mr. Walker and other inmates that retaliation was indeed the purpose of putting hair in his food. This creates a genuine dispute of material fact.

The Officer Defendants' Motion for Summary Judgment on Mr. Walker's First Amendment Retaliation claim is **DENIED**.

## V.
### CONCLUSION

In accordance with the above analysis, the Court makes the following rulings:

1. All Defendants are entitled to summary judgment as to the various instances where Mr. Walker received bad batches of food.

2. The Motion for Summary judgment is **GRANTED** as to Mr. Walker's Eighth Amendment deliberate indifference claim against Grievance Manager Thomas Wellington and Grievance Specialist Shelby Crichfield. [50.]

3. The Motion for Summary Judgment is **DENIED** as to Mr. Walker's Eighth Amendment deliberate indifference claim against Warden Frank Vanihel, Lieutenant Holcomb, Sergeant Simmerman, Sergeant Smith, Officer Neff, Officer Arnold, and Officer J. Jobe. [50.]

4. The Aramark Defendants' Motion for Summary Judgment is **GRANTED** as to Mr. Walker's Eighth Amendment *Monell* claim against Aramark Food Services**.** [46.]

5. The Motion for Summary Judgment is **DENIED** as to Mr. Walker's deliberate indifference claim against Aramark Food Service Manager B. Butler. [46.]

6. The Corrections Defendants' Motion for Summary Judgment is **DENIED** as to Mr. Walker's First Amendment retaliation claim against Officer J. Jobe. [50.]

No partial final judgment shall issue.

The Court prefers that Mr. Walker be represented by counsel for the remainder of this action. The **clerk is directed** to send Mr. Walker a motion for assistance recruiting counsel with his copy of this Order. Mr. Walker shall have twenty-eight days to file a motion for counsel using this form motion or to inform the Court that he wishes to proceed pro se. Once the motion has been ruled on and counsel has been recruited, the magistrate judge is asked to schedule a telephonic status conference to discuss further proceedings.

Date: 3/10/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

RAFAEL L. WALKER
166671
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Christopher Douglas Cody
HUME SMITH GEDDES GREEN & SIMMONS
ccody@humesmith.com

Elijah B. Mollet
Lewis And Wilkins LLP
emollet@lewisandwilkins.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com

Georgianna Q. Tutwiler
HUME SMITH GEDDES GREEN & SIMMONS
gquinn@humesmith.com